Filed 8/14/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S080477 |
| v. | ) | |
| | ) | |
| KELVYN RONDELL BANKS, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA109260 |
| _____ | ) | |

Defendant Kelvyn Rondell Banks was convicted by a jury in 1998 of two counts of first degree murder (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated), one count of attempted murder (§§ 187, subd. (a), 664), one count of forcible rape (§ 261, subd. (a)(2)), one count of forcible oral copulation (§ 288a, subd. (c)), one count of first degree residential robbery (§ 211), one count of first degree residential burglary (§ 459), and one count of attempted second degree robbery (§ 211). The jury also found true the special circumstances allegations of multiple murder, robbery murder, and burglary murder (§§ 190.2, subd. (a)(3), (l7)(A) & (G)); the allegations that defendant personally used a firearm in the commission of each offense (former § 12022.5, subd. (a)); and the allegation that the attempted murder was committed willfully, deliberately and with premeditation (§ 664, subd. (a)). Defendant was acquitted of a third murder count related to the killing of Michael Haney in a separate incident.

The first penalty phase trial ended in a mistrial. After a penalty phase retrial, a jury returned a verdict of death in 1999. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)), sentenced defendant on the noncapital counts and enhancements, and imposed a sentence of death.

This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) As explained below, the conviction on count 2 of willful, deliberate, and premeditated attempted murder must be reduced to attempted murder. In all other respects, we affirm the judgment.

## I. FACTS

### A. Guilt Phase

1. *Prosecution Evidence*

   a) *Crimes against Charles Coleman and Latasha W.*

   (1) *Latasha W.*

Latasha W. testified that during the early morning hours of July 1, 1996, defendant raped her, shot her, and murdered Charles Coleman.

At 2:00 a.m., her friend Charles Coleman, a parapalegic confined to a wheelchair but able to drive, was driving her in his car to his house on Halldale Avenue in Los Angeles. Latasha W., who was 17 years old at the time, began taking shopping bags from the car to the house. As she was returning to the car, Latasha W. saw defendant and another man approach Coleman's car from an alley around the corner of the street. Coleman appeared to know defendant and the other man. At Coleman's request, defendant pulled Coleman and his wheelchair up the three or four steps that led to the house.

Once inside the house, defendant stood directly behind Coleman and pointed a gun at the back of his head. Defendant pulled the gun trigger twice, but the weapon did not discharge. Defendant pulled the trigger a third time, firing a

2

single bullet into the back of Coleman's head. The impact caused Coleman to fall to the floor from his wheelchair.

Defendant grabbed Latasha W.'s arm and forced her into Coleman's bedroom where he demanded the location of Coleman's money and drugs. Latasha W. responded that she did not know where Coleman stored his drugs, but that he kept his money in a hole inside his mattress. Defendant instructed Latasha W. to kneel in the corner of the bedroom; he then threw the mattress on top of her. From underneath the mattress, Latasha W. could hear the two men rummaging through the bedroom.

Defendant eventually removed the mattress. He then led Latasha W. by the arm to the laundry room, where he unbuckled his pants while holding his gun in his right hand. Defendant then ordered Latasha W. to get on her knees and, after placing the gun on top of the washing machine, forced her to orally copulate him. He then ripped her shorts, forced her onto her hands and knees, and raped her. After ordering Latasha W. to lie down on her back, defendant raped her a second time.

Defendant then took Latasha W. into the kitchen, where the second man was standing with a third man. Defendant kept Latasha W. in the kitchen while the other two men rummaged through the house. Defendant and his accomplices referred to one another as "Blood," a term Latasha W. believed had gang significance. Although Latasha W. did not know if Coleman was a gang member at the time of his death, she was aware that he used to be affiliated with the Black Stone gang, a Bloods gang affiliate.

Latasha W. was led into the living room and forced to lie facedown on the floor. Using a telephone cord, the second man tied Latasha W.'s hands and legs. The men then searched the house for five to seven minutes until Latasha W. heard one of the men say they had found what they were looking for. The two

3

accomplices exited the house, but defendant remained inside. Defendant shot Coleman again, striking him in the head. From a distance of approximately six feet, defendant shot at Latasha W. The bullet struck her ear as she lay facedown on the floor in the living room. Latasha W. remained motionless until she heard the three men drive away in Coleman's car. After waiting several minutes, Latasha W. ran outside the house to seek help.

At trial, Latasha W. identified defendant as the person who shot Coleman and sexually assaulted and shot her.

### (2) *Los Angeles Police Officer Martin Martinez*

Los Angeles Police Officer Martin Martinez testified that around 3:00 a.m. on the morning of July 1, 1996, Latasha W. flagged him down in his patrol car on Slauson Avenue. Latasha W. told Officer Martinez that her friend had just been shot and that she had been raped and shot. She described the shooter as an African-American male who was approximately 27 years old, five feet nine inches tall, 180 pounds, and bald. She reported that the shooter was wearing a black jacket, a white T-shirt, and black or dark-colored shoes. The gun he was carrying was made of stainless steel.

### (3) *Madeline Marini*

Madeline Marini testified that on July 1, 1996, she performed a sexual assault examination on Latasha W. at California Hospital. Marini collected oral, vaginal, and rectal swab specimens from Latasha W. and drew a blood sample. Latasha W. had physical injuries that were indicative of sexual assault, including redness, abrasions, and small broken vessels in the vagina. Latasha W. described the rape suspect as five feet nine inches tall, 170 pounds, bald, and wearing black clothes.

4

*(4)     Los Angeles Police Detective Sal LaBarbera*

Los Angeles Police Detective Sal LaBarbera testified that on July 1, 1996, at about 3:30 a.m., he was notified of a homicide at 5835 South Halldale Avenue. LaBarbera responded to the crime scene with his partner, Officer Christopher Barling.

LaBarbera further testified that on August 7, 1996, he presented Latasha W. with a six-pack photographic array. As he was removing the six-pack from his binder and before he could place the photo array on the table, Latasha W. "blurted out that she already sees him, the person that she identified." Latasha W. then selected defendant's photograph and identified him as her and Coleman's assailant.

*(5)     Deputy Medical Examiner Pedro Ortiz*

Deputy Medical Examiner Pedro Ortiz testified that he conducted an autopsy on Coleman's body on July 3, 1996. Coleman had been shot twice. One bullet entered the back of his head, passed through the back of his skull, and exited through the center of his head. Soot deposits and evidence of gunpowder on the entrance wound suggested that this wound was made at close range. A second bullet entered the left side of his head above the left earlobe and exited through the right temple. This second wound was sustained from a distance of more than two feet.

*(6)     Criminalist Michael Mastrocovo*

Michael Mastrocovo, a criminalist employed by the Los Angeles Police Department, testified that he was responsible for analyzing sexual assault evidence for criminal court cases. He testified that he analyzed the items in Latasha W.'s rape kit and found sperm on all three vaginal slides, the vaginal aspirate, and the rectal swab and slide. Sperm was also detected in a stain on the crotch area of Latasha W.'s underwear. On April 30, 1997, Mastrocovo sent the vaginal swab

5

samples from Latasha W.'s rape kit, along with blood samples drawn from Latasha W. and defendant, to Cellmark Diagnostics (Cellmark) for DNA analysis.

### (7)  Dr. Robin Cotton

Dr. Robin Cotton, the director of Cellmark, testified that Cellmark conducted a DNA analysis of the vaginal swabs and blood samples submitted by Mastrocovo.  The DNA from the sperm fraction of the swabs was compared to the DNA from defendant's blood sample; the DNA matched at all nine loci tested, meaning that defendant could not be excluded as the donor of the sperm sample. Latasha W. could not be excluded as a match with the DNA in the nonsperm fraction, which is consistent with the swab having been taken from her.  Dr. Cotton testified that the combination of allele types common in the sperm sample and defendant's blood sample would occur in about one in 17 million people in the African-American population.

### (8)  Stipulation

The parties stipulated that a tattoo on defendant's left arm reads "HPB," which stands for Harvard Park Bloods or Harvard Park Brims.  The Harvard Park Brims are a Bloods gang affiliate operating in an area of Los Angeles roughly bounded by Slauson Avenue, Vermont Avenue, Gage Avenue, and Western Avenue.  The word "Blood" is a term commonly used between members of Bloods gangs.

### b)  Crimes Against Charles Foster

### (1)  Sandra Johnson and Yvonne McGill

Sandra Johnson and Yvonne McGill testified that on July 26, 1996, around 12:30 a.m., Johnson drove McGill and Charles Foster to the Home Savings Bank located on Vermont Avenue in Los Angeles.  Johnson and McGill waited in the car while Foster went to the automated teller machine (ATM).  McGill was

6

watching Foster, who was fumbling around with some items, possibly looking for his ATM card.

From her side view mirror, Johnson saw a hooded man wearing a red bandana over his face approach the passenger side of the car. Because the man's eyes were not concealed, Johnson could tell he was African-American and had brown eyes. McGill turned to look out the passenger side window and saw the man standing with a handgun pointed directly at her. She looked into his eyes and started screaming. Johnson started her car and drove away while the masked man looked at Foster standing about 12 feet away by the ATM. After driving a short distance, they heard two gunshots.

Johnson and McGill stopped a nearby police vehicle and reported that someone had shot their friend at the ATM. The police car responded to the bank followed by Johnson and McGill. When they arrived, Foster was dead, lying face-down in front of the ATM.

On August 27, 1996, McGill was shown a photographic six-pack and selected a photograph of defendant as having "eyes [that] look like the guy with the gun." McGill testified at trial that defendant appeared to be the person whose eyes matched those of the man who killed Foster.

### (2)    *Detective Frank Weber*

Detective Frank Weber testified that he responded to a crime scene at the Home Savings Bank on July 26, 1996 with his partner, Detective Paul Wright. Detective Weber recovered two firearm casings within five to 10 feet of Foster's body. A Sizzler discount card was in the receipt slot of the ATM, which had sustained damage from a bullet strike. Two expended bullets were recovered: one inside the ATM and the other in an alley west of Vermont Avenue. An empty deposit envelope was clenched in Foster's right hand beneath his body.

7

Detective Weber further testified that on July 29, 1996, he took statements from both Johnson and McGill. Johnson described the person who approached her car as an African-American male approximately five feet eight inches tall. He was wearing a red hoodie with a red scarf. McGill stated that the gunman had a red sweater wrapped around his head and was wearing a large black jacket. He was African-American and approximately five feet nine inches tall.

### (3)     Dr. Eugene Carpenter, Jr.

Dr. Eugene Carpenter, Jr., a medical examiner working for the Department of Coroner of Los Angeles County, testified that he performed an autopsy on Foster's body. Dr. Carpenter concluded that Foster had sustained two fatal gunshot wounds. The first bullet entered his right hand and exited the base of his right thumb; it then created a second entrance wound at his throat and exited near his neck on his left shoulder. The second bullet struck the back of Foster's head and exited through his forehead.

### (4)     Patricia Manzanares

Patricia Manzanares testified that she lived in a ground floor apartment adjacent to the Home Savings Bank parking lot. On the night of the Foster shooting, Manzanares saw two men pass by her window. One man stayed in front of the window in an alley while the other man, whom Manzanares later identified as defendant, walked toward the bank. Defendant was wearing a mask. Defendant approached Foster, who was using the ATM, and shot him. Defendant then returned to the alley near Manzanares's apartment window and removed his mask. Manzanares was able to see his face. Defendant laughingly told the other man who had stayed by the window, "Oh shit" and "Goddamn." The men left the area in a large green Cadillac with a white top.

8

Manzanares called the police. She described the shooter as an African-American male, 25 to 26 years old, about five feet six or seven inches tall, and about 190 pounds. He had a short "Afro" haircut, a chubby face, and some whiskers around his upper lip and chin. He was wearing a black-and-white checkered shirt, a heavy black jacket, black baggy jeans, and a red mask that extended below his collar.

On August 7, 1996, Manzanares was shown a single photographic six-pack and selected defendant's photograph as depicting the man who shot Foster. She identified defendant's photograph from the same six-pack again on August 21, 1996, and again before the grand jury on August 27, 1996. On February 18, 1997, Manzanares identified defendant as the gunman in a live lineup. Manzanares testified at trial that defendant was the person she saw shoot Foster.

### (5) Los Angeles Police Officer Marcelo Raffi

Los Angeles Police Officer Marcelo Raffi testified that on July 31, 1996, around 12:30 a.m., he and his partner were patrolling the area of Harvard Park near Vermont Avenue in a marked patrol car. Defendant was among a group of people walking southbound on Vermont Avenue. Defendant began running when he saw the police and was detained after a brief pursuit. Before he was stopped, Officer Raffi saw defendant drop an object on a pile of wood. Officer Raffi recovered a loaded bluesteel nine-millimeter semiautomatic handgun from the place defendant had dropped the object.

Officer Raffi arrested defendant. The report of defendant's arrest indicated that defendant was five feet 10 inches tall and weighed 225 pounds. His booking photograph depicted him wearing a black or blue denim jacket that fell somewhere between his thighs and knees.

9

*(6)     Detectives Paul Wright and Frank Weber*

Detectives Paul Wright and Frank Weber testified that on August 21, 1996, they executed a search warrant at defendant's residence at 1446 West 58th Place in Los Angeles, located about 50 yards from Coleman's house and about one-half mile from the bank where Foster was murdered. They recovered an extra-large black jacket on the floor inside a bedroom closet. Officer Raffi identified the jacket as the same one defendant had been wearing on July 31, 1996, and Manzanares identified the jacket as the one worn by the man who shot Charles Foster. The police also recovered four red T-shirts and a pair of black jeans, two ammunition boxes containing live nine-millimeter bullets, and an empty ammunition box.

*(7)     Stipulations*

The parties entered several stipulations regarding the ballistics evidence. The nine-millimeter handgun Officer Raffi recovered was operable. The handgun fired both of the Speer cartridge casings and both of the bullets recovered from the Foster and Haney crime scenes. The handgun contained nine-millimeter rounds manufactured by CCI, Norenco, Federal, and Speer. The Speer cartridge casing in the handgun and the Speer cartridge casings from the Foster crime scene bore the same head stamp and shared the same caliber, brand, type, and material composition. One box of ammunition recovered from defendant's residence was for Speer nine-millimeter ammunition; the Speer materials from the handgun and the Foster crime scene were commonly packaged in that type of box. The empty ammunition box recovered from defendant's residence was for CCI ammunition, and the CCI cartridges found in the handgun were of the type commonly packaged in that type of box.

## 2. *Defense Evidence*

Defendant did not testify on his own behalf. However, he presented testimony from Los Angeles Police Officer Donna Shoates and Detective Sal LaBarbera.

Officer Shoates and her partner transported Latasha W. to California Hospital for the sexual assault examination on July 1, 1996. Officer Shoates testified that Latasha W. described the man who had attacked her as an African-American male who was bald, five feet nine inches tall, and about 175 pounds; he was wearing a large black jacket, a white T-shirt, and black pants. Latasha W. told Officer Shoates that the man who attacked her did not ejaculate and that Coleman was a gang member and known drug dealer.

Detective LaBarbera testified that on July 12, 1996, he showed Latasha W. a binder with over 100 photographs of Six Deuce Brims and Harvard Park Bloods gang members. Defendant's photograph was not included in that binder. Latasha W. identified the photograph in position number 11, stating that the person depicted in that photograph "looked like" the person who attacked and shot her. On a copy of the page, Latasha W. circled the photograph in position number 11, initialed and dated it, and wrote "looks like him." The man Latasha W. identified was in custody at the time of the incident.

Detective LaBarbera acknowledged that his report indicated defendant weighed 210 pounds, whereas Officer Raffi's report indicated defendant weighed 225 pounds. On cross-examination, Detective LaBarbera testified that despite writing in his report that the gunman was "clean shaven, possible stubble," Latasha W. actually described the gunman who raped her as having a mustache and a small goatee.

The defense also cross-examined various witnesses called by the prosecution, including Dr. Robin Cotton, Yvonne McGill, and Patricia

11

Manzanares. Dr. Cotton testified on cross-examination that the Cellmark database used to compute the probability of a specific set of genes occurring in a member of the African-American population contained a sample of 100 African-Americans living across the United States; that the database did not account for inter-racial or mixed race ethnic groups; that the database included only samples from Caucasians, African-Americans, and Hispanics (not Asians or Native Americans); and that the true frequency of the combination of genes occurring in a given population could be 10 times greater or 10 times less than the estimated frequency. Dr. Cotton further testified that the Cellmark analysts who performed the DNA testing prepared two reports, one on June 2,1997, and one on June 30, 1997. In preparing the first report, Cellmark tested five loci and found that the DNA from the sperm sample and the DNA from defendant's blood sample was identical at each locus tested. The probability that a member of the African-American population would have the same combination of alleles found in both the sperm sample and blood sample at each of the five loci would be one in 8,000. In preparing the second report, Cellmark tested an additional four loci and again found a perfect match between the sperm sample and defendant's blood sample. The probability that a member of the African-American population would have the same combination of alleles found at each of the nine loci tested would be one in 17 million.

Yvonne McGill acknowledged on cross-examination that "most of [defendant's] face was covered" when she saw him; that she had stated during her grand jury testimony that she had only gotten a "glimpse" of the gunman; and that she had told Officer Weber that the gunman had a dark complexion, whereas she would describe defendant as "[l]ight skinned."

Patricia Manzanares acknowledged on cross-examination that the jacket worn by the gunman is common among African-American men in her

12

neighborhood.  She also acknowledged that she had previously described the gunman as five feet seven inches tall and wearing a black-and-white checkered shirt and a heavy black-and-white jacket.

## B.  First Penalty Phase

During the first penalty phase trial, the prosecution presented the testimony of Eddie Candelaria, Armando Quintana, Lashan Thomas, Sandra Hess, Thomas Butler, Richard Bee, Joseph Elloie, Henry Nandino, Bridget R., Sandra Vinning, Chandra Vinning, and Roberto Perovich.  The defense presented the testimony of Linda Allen, Barbara Sparks Mitchell, Brian Keith Mitchell, Carole Sparks, Louis Weisberg, Ira Mansoori, Michael E. Gold, and Nancy Kaser-Boyd.

After a period of deliberation, the court concluded that the jury was unable to reach a unanimous verdict and declared a mistrial.  The jury's vote at the time of the declaration of a mistrial was 11 to one in favor of a death sentence.

## C.  Penalty Phase Retrial

### 1.   *Prosecution Evidence*

#### a)   *Prior Violent Criminal Activity*

##### (1)   *Lashan Thomas and Luz Hernandez*

Lashan Thomas testified that on January 23, 1988, at 8:00 p.m., she and defendant were walking down the street behind Luz Hernandez.  Defendant, holding a pipe in his hand, said, " 'Watch me rob her.' "  Defendant approached Hernandez and demanded her money and her purse.  When Hernandez refused, defendant struck her across the back of the head with the pipe.  She fell to the ground, and defendant took about $20 from her.  Thomas and defendant fled but were later apprehended.

Hernandez and her husband were unavailable at the time of the penalty phase trial, but their testimony from the juvenile proceeding held on February 24,

13

1988 was read to the jury. Hernandez testified that the blow to her head resulted in a hematoma that was swollen for five days. She was three months pregnant when she was struck and miscarried about five days later. Hernandez's husband testified that he saw defendant and Thomas running from Hernandez after she screamed.

### (2)    Sandra Hess

Defendant was a student in Sandra Hess's literacy class at the Barry J. Niedorf Juvenile Hall. Hess testified that on March 31, 1988, defendant approached her desk without permission and challenged her refusal to give him a "good gram," an acknowledgment of a student's good behavior. While Hess was in the process of removing defendant from the classroom for refusing to return to his seat, defendant put Hess in a "choke hold," rendering her unable to breathe or talk. As defendant moved Hess across the room in the choke hold, he yelled at another student, " 'Come on. You said you'd help me. We'll get her.' " When the other student instead reached for the emergency telephone, defendant stated, " 'Don't pick up the phone. Don't do that.' " As soon as the other student picked up the phone, defendant sat on the chair beside Hess's desk and smiled. As a result of the assault, Hess sustained a bruised larynx; her throat was sore for six weeks, and she had to speak in a whisper for a week.

### (3)    Richard Bee

On August 5, 1989, defendant was in the custody of the California Youth Authority (CYA) at Humboldt Hall. Sergeant Richard Bee testified defendant refused to be quiet and go to sleep, so he informed defendant he would be placed in a detention room until the morning. Defendant became argumentative and aggressive. Bee then sprayed defendant with Mace, and as he did so, defendant

14

swung and struck Bee in the chin and chest. Bee sustained a sore jaw and a bruised chest.

### (4) Bridget R.

Bridget R. testified that she dated defendant for about three months, during which time they lived together with Bridget R.'s sister and three-year-old daughter. On February 21, 1994, defendant accused Bridget R. of cheating on him and became very violent. He struck Bridget R.'s face with his fists multiple times; forced Bridget R. to orally copulate him; hit her on the top of her head with hair clippers, causing her to bleed from her forehead; choked her to the point of unconsciousness three times; and raped her in front of her daughter. At the time of the attack, defendant was aware that Bridget R. was pregnant with his child or possibly his twins. The attack caused a miscarriage.

Defendant eventually tied Bridget R. up with a telephone cord. He then left the house to buy a new telephone cord and took Bridget R.'s daughter with him, telling Bridget R.: " 'I'm taking your little girl in case you get loose.' " Bridget R. freed herself, ran upstairs to a neighbor's residence, and asked the neighbor to call the police. When defendant returned, Bridget R. pretended that she had just gotten loose.

When the police arrived, Bridget R. told the police what had happened. Defendant subsequently called Bridget R. from jail and apologized for causing the miscarriage. However, he also threatened to kill Bridget R.'s family members if she testified against him.

### (5) Deputy Roberto Perovich

Los Angeles County Sherriff's Deputy Roberto Perovich testified that on December 10, 1996, around 11:00 p.m., he was patrolling the disciplinary cells at East Facility when he heard screaming from one of the cells. Upon responding to

15

the cell with another deputy, Deputy Perovich observed that inmate Sevedo Sanchez was screaming and had redness and swelling on the left side of his face. Defendant was the only other occupant of the cell. Deputy Perovich observed a Bible in the cell toilet.

### (6) *Deputy Arthur Penate*

Los Angeles County Sheriff's Deputy Arthur Penate testified that on January 31, 1999, he was conducting a security check of the seventh floor of the Twin Towers jail facility. The seventh floor housed two types of prisoners in single cells: mentally ill inmates and extremely violent inmates. Deputy Penate understood that defendant fell into the latter category. Deputy Penate opened a small slot in the cell door to give defendant his food. As he received the tray, defendant bent down and threw a carton containing feces and urine at Deputy Penate. Defendant aimed at Deputy Penate's face but struck him in the torso. In the days following the incident, defendant laughingly told Deputy Penate, " 'See. See. I told you I was going to get you.' " Defendant also wrote, "Penate is a bitch" and "Fuck off" on the interior walls of his cell, along with various gang-related comments.

Deputy Penate further testified that a few days before the incident, defendant accused Deputy Penate of "disrespecting" him when Deputy Penate told another inmate that defendant was a troublemaker. On a separate occasion about two weeks before the incident, defendant complained that his food was late. When Deputy Penate told him to be patient, he replied: " 'No. No. No. No. No. Let me tell you who I am and how it is. [¶] Let me tell you who I am and what I am capable of doing. [¶] . . . [¶] You know who I am? [¶] You better ask your deputy friends and ask who I am.' "

16

Finally, Deputy Penate testified that defendant "continuously manipulates and tries to control other deputies" and that defendant would often condition his compliance with orders from prison staff on receiving special items such as extra clothing or blankets.

### b) Circumstances of the Crimes

#### (1) Crimes against Coleman and Latasha W.

The prosecution presented substantially the same evidence in the penalty retrial that was presented at the guilt phase of the trial, including the testimony of Detective Sal LaBarbera, Latasha W., and Dr. Pedro Ortiz. The parties stipulated to the substance of the DNA evidence testimony provided by Madeline Marini, Michael Mastrocovo, and Dr. Robin Cotton.

#### (2) Gang Expert Testimony

Los Angeles Police Detective Christopher Barling testified as an expert on the Harvard Park Brims gang, also known as the Six Deuce Brims gang. The Harvard Park Brims gang was an African-American Bloods gang affiliate that was associated with the color red. It was not uncommon for members of the Harvard Park Brims gang to refer to themselves as "Blood." The Coleman and Foster crime scenes were within the territory of the Harvard Park Brims gang. Defendant had the letters H.P.B., short for Harvard Park Brims, tattooed on his left arm.

#### (3) Crimes against Foster

The prosecution presented substantially the same evidence in the penalty retrial that was presented at the guilt phase, including the testimony of Detective Frank Weber, Yvonne McGill, Patricia Manzanares, and Officer Marcelo Raffi.

The parties also stipulated to the following facts: (1) the gun recovered by Officer Raffi was the murder weapon in the Foster shooting; (2) the recovered gun contained six live rounds, including two CCI brand rounds and one Speer brand

17

round; (3) the Speer round in the recovered gun and the Speer cartridge casings recovered from the Foster crime scene were the same types of rounds that were found in the ammunition box recovered from defendant's residence; (4) police executed a search warrant at defendant's residence and recovered four red T-shirts, an empty nine-millimeter luger ammunition box, and a jacket; (5) Dr. Steve Scholtz performed an autopsy on Foster and determined the cause of death was gunshot wounds to the head; and (6) a blood screening revealed cocaine metabolite in Foster's system.

### c) Victim Impact Testimony — Chandra Vinning

Coleman was survived by his elder sister Chandra Vinning (Chandra), his mother Sandra Vinning (Sandra), and his daughter. Because Sandra suffered from a medical disability that made it difficult for her to write, Chandra wrote a letter that summarized Sandra's feelings about losing her son. Chandra testified that Coleman had been a great help to Sandra, ensuring that she went to her numerous doctor's appointments by driving her or giving her cab fare. Sandra's health had deteriorated since Coleman's death.

Chandra further testified that Coleman's daughter was "the joy of his life." She identified a photograph depicting Coleman with his daughter, who was then four years old. On the night of his murder, Coleman had taken his daughter to an amusement park.

### 2. Defense Case

### a) Defendant's Mental Health

### (1) Dr. Louis W. Weisberg

Dr. Louis W. Weisberg, a board-certified psychiatrist, testified that he evaluated defendant at the CYA in 1988. Although Dr. Weisberg had no independent recollection of the evaluation, he had written a report about it. The

18

report indicated that defendant had made the following statements with respect to his attack on Sandra Hess: (1) "he felt very frightened of what he had done because Hess was older"; (2) "he was afraid that he might really hurt someone"; and (3) "[h]e feels frightened about his behavior." The report also indicated that defendant's mother had a history of alcohol and drug abuse.

Dr. Weisberg diagnosed defendant with severe conduct disorder "[u]ndifferentiated" type. Conduct disorder is characterized by disruptive conduct, a disregard for law and authority, and an avoidance of consequences. Conduct Disorder also refers to a pattern of antisocial behavior in persons under the age of 18. In adults, antisocial personality disorder is characterized by an unstable employment history, frequent arrests due to unlawful behavior, aggressiveness, impulsiveness, a tendency to lie, and an absence of remorse. Dr. Weisberg also diagnosed defendant with intermittent explosive disorder, a disorder characterized by outbursts of violent or aggressive behavior. He noted that defendant had reported a history of blackouts associated with violence.

In his report, Dr. Weisberg recommended that defendant be evaluated to rule out organic brain disorder and a seizure disorder. Defendant required "an intensive treatment program."

### (2)    Dr. Michael Gold

Dr. Michael Gold, a medical doctor practicing as a neurologist, testified that he performed a neurologic examination on defendant for purposes of the penalty phase trial. The examination included an interview with defendant and a general physical examination. It also included the following diagnostic tests to evaluate defendant's brain characteristics and function: (1) a brain wave or electroencephalogram (EEG) test; (2) a magnetic resonance imaging (MRI) brain scan; and (3) a single photon emission computed tomography (SPECT) scan, a

19

nuclear imaging test that employs glucose injected with radioactive material to measure brain activity.

The physical examination revealed that defendant's general physical health was normal. The neurologic test, however, suggested that defendant perceived less sensation on the left side of his body. The left side of defendant's body also demonstrated different reflexes than the right side. The results of these tests indicated to Dr. Gold that something was affecting the right side of defendant's brain.

Defendant's EEG test and MRI scans were normal. The SPECT scan, however, revealed an abnormality: a decrease in the utilization of the radioactively laced glucose in the temporal lobes.

Based on the "complimentary [sic]" results of defendant's physical exam and the SPECT scan, Dr. Gold diagnosed defendant with malfunction or abnormal function of both of his temporal lobes. The left temporal lobe is responsible for understanding, reading, speaking, and writing language, and the right temporal lobe is responsible for behavior, impulse control, and emotions.

### (3)    Dr. Carl Osborne

Dr. Carl Osborne, a forensic psychologist, testified that he was engaged by the defense in 1998 to interview and diagnose defendant. Dr. Osborne spent about 18 hours with defendant over eight visits. He reviewed extensive records pertaining to defendant, including previous psychological and psychiatric reports, records from the Department of Social Services and Child Protective Services, interviews with defendant's family members, and some of defendant's own writings. Dr. Osborne also performed three psychological tests on defendant: (1) the Wechsler Adult Intelligence Scale Third Edition, an IQ test comprised of 14 separate subtests measuring different areas of functioning; (2) the Validity

20

Indicator Profile, a test designed to measure whether the test taker is malingering; and (3) the Wechsler Memory Scale, a test used to assess the test taker's memory.

Defendant was cooperative during the interviews and testing. Defendant scored a 94 on the Wechsler Adult Intelligence Scale, indicating normal intelligence. However, Dr. Osborne found that defendant seemed to have significant difficulty with three tasks that comprise "working memory," which is the ability to store information in one's brain and manipulate that information on a short-term basis. Defendant appeared eager to do the best he could on the Validity Indicator Profile test, but the results of that test suggested that defendant was not paying close attention to what he was doing.

Dr. Osborne concluded that defendant suffered from several severe and chronic mental illnesses. He diagnosed defendant as suffering from intermittent explosive disorder. Individuals suffering from this disorder experience periods during which tensions or emotions build up until they "explode" in the form of aggressive or violent behavior. An explosive episode is followed by a period of quiescence, during which the pressure builds anew. Dr. Osborne also opined that defendant probably suffers from substance dependence.

According to Dr. Osborne, defendant's test results were consistent with Dr. Gold's theory of underlying brain damage. In particular, a diagnosis of intermittent explosive disorder would be consistent with temporal lobe damage because the temporal lobe affects impulse control and intermittent explosive disorder is an impulse control disorder. Similarly, a problem with working memory would be consistent with Dr. Gold's diagnosis of temporal lobe damage.

Dr. Osborne opined that defendant's behavior throughout his life was influenced by the following factors: (1) his mother was a drug addict who neglected him; (2) his early life was very chaotic; (3) his mother took him away from his aunt's home where he was happy; (4) his father was absent from his life

21

and very violent toward his mother; (5) he suffered extreme intrauterine trauma caused by a car accident that occurred when his mother was pregnant; and (6) he had deficient working memory, which is consistent with brain damage and an impaired ability to reason.

Dr. Osborne testified that medications exist that could control defendant's behavior, but that these medications must be taken on a very regular basis over a long period of time to be effective. On cross-examination, Dr. Osborne stated that defendant will likely remain as violent as he has ever been but that his violent behavior might remit as he aged.

### (4)    Dr. Iraj Mansoori

Dr. Iraj Mansoori, a psychologist with a Ph.D. in clinical psychology, testified that in 1991 he counseled defendant for approximately 12 to 15 hours over the course of six months while defendant was a ward at the CYA. Dr. Mansoori got along well with the defendant.

On May 14, 1991, Dr. Mansoori wrote a parole evaluation report on defendant. Defendant was found not suitable for parole. In response to being informed by Dr. Mansoori that he would not be paroled, defendant stated simply, "That's okay." Dr. Mansoori interpreted defendant's response as indicating a preference for the CYA over what defendant was offered at home.

### b)    Defendant's Childhood

### (1)    Mary Goldie

Mary Goldie testified that on January 21, 1977, she was a detective with the Pasadena Police Department assigned to the juvenile section. On that day, a woman by the name of Mrs. Berkins came in with defendant, who was three years old at the time. Berkins was not a relative, and no relative could be located. Goldie took defendant into protective custody and transported him to a shelter care

home arranged through McClaron Hall, a facility for abused and neglected children.

### (2) Juanita Terry

Juanita Terry testified that in 1978 she was working as a protective services employee in the "Metro Office" of the Los Angeles County Department of Public Social Services. Terry was assigned to defendant's case on March 31, 1978. By that time, defendant had been placed with his aunt, Barbara Mitchell. He had been removed from his mother's care because she was mentally unstable, had been beating him, and had not provided him consistent care and supervision.

Terry's notes indicated that on several occasions, defendant's mother had attempted to remove him from nursery school or had interfered with his care in Mitchell's home. In October 1978, defendant's mother regained custody of defendant against Terry's recommendation.

### (3) Ms. Emery

The parties stipulated to the testimony that would have been provided by a certain Ms. Emery, who was defendant's and his mother's neighbor in 1978. Emery would have testified that during January and February of 1978, she witnessed defendant's mother speaking to people who were not there and "scream[ing] and yell[ing] and act[ing] strange." Emery also witnessed defendant's mother striking him. As a result of these observations, Emery called the Department of Public Social Services.

### c) Defendant's Family

### (1) Linda Allen

Linda Allen is defendant's maternal aunt; defendant's mother, Carole Sparks, is her older sister. Allen testified that Sparks was a heavy drug user and stripper. Sparks discovered she was three months pregnant with defendant after

23

she was hit by an automobile while exiting a nightclub.  She sustained serious injuries and was in a full body cast for a "long time."  Allen took care of Sparks while she was injured, and Sparks told her that she did not want to keep the baby.  While pregnant, Sparks took prescribed medication and illegal drugs.  She gave birth to defendant while her pelvis and legs were still in casts.

Allen testified that defendant's father, Melvyn Banks (Melvyn), was very abusive.  Melvyn burned Sparks with cigarettes and beat her with golf clubs.  Allen recalled one time when she went in an ambulance with Sparks after finding Sparks on the floor of her apartment with burns to her chest.  Allen could not remember whether this incident occurred before or after defendant was born because there were so many similar incidents.  Melvyn died two or three years before defendant's trial.

Sparks attempted suicide many times.  Once she drank Drano.  Allen could not recall if that incident occurred before or after defendant's birth.

After she got married in 1975, Allen did not see defendant for a long period of time.  Allen renewed contact with defendant in 1978 when he was three or four years old and living with Allen's and Sparks's sister, Barbara Mitchell.  When defendant was returned to his mother's custody, Allen again lost contact with him.  Sparks prohibited Allen from having contact with defendant and, at one point, attempted to attack Allen and threatened to kill her and burn down her house because she thought Allen had picked up defendant from a foster home where he was living.  Although defendant was affectionate towards Sparks, Sparks never reciprocated his affection.

Allen saw defendant at a grocery store when he was six or seven years old.  Defendant was trying to make money for his mother by taking customers' grocery bags to their cars.  Allen prepaid a grocery store to provide defendant food

24

because he complained that he was hungry. She did not give defendant money directly because he would give it to his mother.

During the period when defendant was not in custody from November 30, 1993 through February 21, 1994, Allen saw defendant frequently at family gatherings. She was "setting him up on programs, taking him [to job] interviews, getting his I.D. and birth certificate" in an attempt to help him become a better person. Defendant was always respectful in Allen's presence and never exhibited any violence towards her or others.

Allen loved defendant and wanted him to live.

### (2) Barbara Mitchell

Barbara Mitchell is defendant's maternal aunt; Carole Sparks is her younger sister. Mitchell testified that she took care of Sparks after Sparks was injured in a car accident. Sparks took prescribed pain medication while she was pregnant with defendant but, to Mitchell's knowledge, did not take any illegal drugs.

At some point after defendant was born, Sparks and defendant went to live with defendant's father Melvyn. Melvyn beat Sparks, choked her, pushed her down stairs, slammed car doors on her, and pulled her hair. Mitchell sporadically cared for defendant during this time.

When defendant was two years old, Sparks dropped him off at the daycare attended by Mitchell's children with a note pinned to his jacket stating, "Take him. I don't want him." Mitchell took defendant and obtained legal custody of him. Defendant lived with Mitchell for about three years, during which time Mitchell cared for defendant as her own. Defendant was an affectionate child. Mitchell believed that defendant loved Sparks, but that he was afraid of Sparks at the same

25

time. Sparks would tell defendant: " 'You're a man child. [¶] You have to fend for yourself.' "

Mitchell testified that Sparks was a drug addict who had used PCP, marijuana, and cocaine. She swallowed Drano one time. Mitchell believed Sparks was crazy.

Sparks eventually told Mitchell she wanted to take defendant back because she was getting child assistance money from the county, and the county had discovered that defendant was not living with Sparks. After a hearing, a court returned custody of defendant to Sparks.

Mitchell had no further contact with defendant until he was about nine years old. At that time, defendant was living in a halfway house because he had been "bad." Mitchell visited him there, and defendant cried during her visits. Defendant was moved from one foster home to another.

Mitchell had never seen defendant act in a violent manner. She loved defendant and did not want him to die.

### (3)     Carole Sparks

Carole Sparks, defendant's mother, testified. She admitted that she had refused to speak with defense counsel and the defense investigator when they contacted her. The two penalty phase trials were the only times she had been willing to speak with defense counsel.

Sparks testified that the accident in which she was seriously injured occurred before she knew she was pregnant with defendant. Sparks admitted to smoking marijuana before the accident but denied ever using heroin, cocaine, or PCP. However, she was on pain medication during her pregnancy. According to Sparks, defendant was born in 1972. But the parties stipulated that defendant was born on April 3, 1973. Sparks denied that Mitchell and Allen took care of her

26

after her accident or that they cared for defendant when he was an infant. She denied that defendant ever lived with Mitchell. She did not get along with either Allen or Mitchell, and referred to them as her mother's daughters, not her sisters.

Sparks denied having been a stripper. She claimed she had been a beauty school student, a bartender, and a waitress. Sparks denied drinking Drano but acknowledged drinking a mixture of peroxide, sugar, water, and a few other ingredients to clear out her system from suspected PCP in her home's ventilation system. She testified that defendant's father lived with her from 1969 through 1971 but denied that defendant's father beat her or that she was accompanied by her sisters to the hospital after any such beatings.

Sparks denied that she dropped defendant off at a daycare center with a note stating she did not want him. Although defendant was in foster homes and a group home for some time, whenever he ran away his probation officer released him to live with her.

Sparks recalled an incident when appellant was nine or 10 years old and he came home with stolen property (possibly a bicycle); she made him return it.

### 3. *Prosecution Rebuttal Case*

At the behest of the prosecution, Dr. Ronald Markman, a forensic psychiatrist, conducted a personal interview with defendant for about one and one-half hours in the lockup area of the courthouse on September 2, 1998. Dr. Markman asked defendant questions about the crimes defendant had committed. He also reviewed defendant's handwritten notes regarding his past.

Dr. Markman testified that defendant denied committing the crimes he was convicted of in the guilt phase. Dr. Markman declined to label defendant manipulative but opined that defendant's responses appeared to be carefully thought through and self-serving.

27

Dr. Markman found defendant's written notes about his childhood memories to be unconvincing. Defendant wrote, for example, that at two years old he was concerned that his mother was being physically abused by his father and that she would die and leave him. Dr. Markman testified it was highly unlikely that defendant would remember an event that occurred when he was two years old. A child typically does not develop the concept of death until he or she is about eight or nine years old.

Dr. Markman opined that several of defendant's violent acts demonstrated premeditation and therefore were not caused by temporal lobe disorder.

Dr. Markman further testified that he is familiar with EEGs, MRIs, and SPECT imaging. Defendant's normal MRI indicated the absence of physical abnormalities. Defendant's normal EEG test suggested that the electrical function in his brain was normal. SPECT imaging, upon which Dr. Gold relied for his diagnosis, shows whether all areas of the brain are getting proper blood perfusion, but cannot be used to make a diagnosis or predict behavior. Dr. Markman accepted Dr. Gold's interpretation that defendant's SPECT scan showed there was some blood flow impairment in defendant's temporal lobes, but he rejected Dr. Gold's conclusion that defendant had brain damage.

## II. DISCUSSION

### A. Guilt Phase Issues

1. *Jury Selection:* Batson/Wheeler *Challenge*

Defendant, who is black, contends that the trial court erred in overruling his objection to the prosecutor's use of peremptory challenges against three black prospective jurors. We disagree.

### a) *Factual Background*

The prosecutor exercised five of his first 11 peremptory challenges against black prospective jurors. Defense counsel did not object to the first four of those challenges. After the prosecution exercised a preemptory challenge against a fifth black prospective juror, defense counsel made a motion under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). She pointed out that the prosecutor had struck five black jurors. Defense counsel argued: "It appeared to me that certain jurors were very neutral on everything."

The trial court noted that it was "an interesting time to bring the motion" because the last prospective juror, Prospective Juror A.I., had been excused for an obvious reason, i.e., she had said that she was not sure she could be fair because defendant was so young. Defense counsel replied that youth is a mitigating factor and added that she "couldn't see the reason for the peremptory on the first woman who was excused which was Juror [J.R.]." Defense counsel then listed the specific prospective African-American jurors that the prosecutor had excused. When the trial court inquired if there was "anything else that [defense counsel] wish[ed] to add," defense counsel responded: "Nothing at this time." Shortly thereafter, defense counsel acknowledged that the challenged prospective jurors had expressed "some degrees [sic] of hesitation" about their ability to impose the death penalty, but suggested that other prospective jurors who had not been challenged had expressed some degree of hesitation as well.

The prosecutor at first declined to comment because no prima facie case of discrimination had been shown. He took the opportunity, however, to clarify the record. The prosecutor noted that he had exercised 11 peremptory challenges: six against women, five against men, five against black jurors, two against white jurors, three against Hispanic jurors, and one against an Asian-American juror. The trial court added that defense counsel had peremptorily struck 10 prospective

29

jurors, comprised of two Hispanics, three Asian Americans, three whites, one black, and one man from the Philippines.

The prosecutor said the current panel included four blacks, two white men, an Armenian man, two white women, an Asian-American woman, and a man of uncertain racial background. Defense counsel agreed that there were four blacks on the jury panel but classified the Armenian man as white and the man of uncertain race as Hispanic.

The trial court concluded that no prima facie showing had been made. It noted that defense counsel had exercised 10 peremptory challenges, only one of which was against a black prospective juror. Defense counsel's strikes were relevant, the trial court reasoned, "not because there is anything impermissible, but [because] it artificially skews things." "[W]hen the defense does not excuse jurors of a particular sex or race, or what have you, the other side is left in a situation where mathematically as a matter of probability the chances will rise dramatically that the prosecution will exercise challenges [against members of the group in question]." "If you take out the green socks out of the drawer and leave the blue ones in," the trial court explained, "any challenge will be made to a blue sock." The trial court further observed that each of the challenged black prospective jurors "gave answers in their questionnaire that present[ed] an ample ground in this case for the prosecution to exercise peremptories." While it was true that all the prospective jurors had "passed the cause muster, which is not that difficult to do," the trial court found that there were "things in the questionnaire" that could legitimately "bother" the prosecution.

The trial court then informed the prosecutor that he was permitted, but not required, to indicate his reasons for striking the five black prospective jurors. The prosecutor responded, "I think it is creating a problem for me to justify when there is no prima facie showing. [¶] I would say that the questionnaires speak for

30

themselves in terms of the answers written there. [¶] The number of answers they provided while they were seated in the box either caused me discomfort or concern on their ability to impose the death penalty. [¶] That is why I excused all of these people was for inability to impose the death penalty."

Asked if she had anything to add, defense counsel noted that although blacks comprised about one-third of the entire panel of 150 jurors, the prosecution had exercised almost half of his peremptory challenges against black jurors. The trial court reiterated that, under the circumstances, it was difficult to draw any inference from the number of challenges alone because "when you don't exclude jurors of a particular race, that means by the nature of math and counting that more of that group will be excluded from the other side because that is what is left when the side makes its challenges." The trial court also said: "Given the answers of those jurors that you complain of, and many other jurors, not just those, other jurors that were excused in this case by the prosecution, it is obvious to the court that the reason the jurors were being excused has to do with answers given in the questionnaire. [¶] . . . [¶] Each of those jurors expressed problems with the concept of the death penalty and its imposition and doubts about their ability and confusion in some cases. [¶] Many I don't know answers and things of that nature. [¶] Many other things that would certainly give pause to a reasonable opponent in a criminal case."

The seated jury consisted of six black and six white jurors.

### b) Analysis

" 'The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection

31

under the Fourteenth Amendment to the United States Constitution.' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1319; see *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*); *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) Although defense counsel invoked only *Wheeler*, a *Wheeler* objection preserves a *Batson* claim. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117−118.)

A *Batson*/*Wheeler* objection triggers a three-step inquiry. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted; see *People v. Thomas* (2011) 51 Cal.4th 449, 473.)

Here, the trial court first found that there was no prima facie case with respect to any of defendant's *Batson*/*Wheeler* claims. Nonetheless, after initially hesitating, the prosecutor accepted the court's invitation to explain his strikes and stated that all three jurors were struck because of what he perceived to be their reluctance to impose the death penalty. The trial court agreed with the prosecution that the challenged jurors had demonstrated reluctance about the death penalty.

"We have characterized such a circumstance as a 'first stage/third stage *Batson* hybrid,' which renders ' "moot" ' whether defendant established a prima facie showing of a discriminatory purpose. [Citations.] 'Accordingly, we express no opinion on whether defense counsel established a prima facie case of discrimination and instead skip to *Batson*'s third stage to evaluate the prosecutor's

32

reasons for dismissing [the] African-American prospective jurors.' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 786–787.)

At the third stage of *Batson*, the "critical question . . . is the persuasiveness of the prosecutor's justification for his peremptory strike." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339.) Usually, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Id.* at p. 339.) " 'As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." ' " (*Ibid.*) Thus, in reviewing a trial court's reasoned determination that a prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court and consider only "whether substantial evidence supports the trial court's conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 627 (*Lenix*).)

In this case, defendant challenges the trial court's ruling with respect to three of the five black jurors struck by the prosecutor: J.R., R.W., and A.I. Defendant first argues that the trial court erred in considering the fact that defendant's decision to strike only one black juror rendered it statistically more probable that the prosecutor would strike black jurors at a higher rate than the rate at which such jurors were represented in the venire. We disagree. In deciding whether substantial evidence supports a trial court's determination that a peremptory challenge was not motivated by race, we must consider the "entire record" before the court. (*Lenix*, *supra*, 44 Cal.4th at p. 621.) In this case, as the trial court explained, the manner in which defense counsel exercised her peremptory challenges provided relevant context. Because black jurors comprised roughly a third of the venire, the fact that defense counsel had exercised only one

33

of her 10 peremptory challenges against a black juror increased the percentage of blacks remaining on the panel, thus increasing the likelihood that the prosecutor would exercise a disproportionate share of his peremptory challenges against black jurors for entirely permissible reasons.

Moreover, the disparity between the percentage of blacks in the entire jury pool and the percentage of peremptory challenges the prosecutor exercised against black prospective jurors is not very significant. The prosecutor used about 45 percent of his peremptory challenges to remove black jurors. Had he removed one fewer black juror, that percentage would have fallen to about 36 percent, almost equal to the percentage of blacks in the entire jury pool. And at the time defendant made his *Wheeler* motion, four of the 12 prospective jurors on the panel — exactly one-third — were black. Given the small sample size at issue, the trial court reasonably refused to infer a discriminatory intent on the basis of these statistics. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 734 (*Cleveland*) [where the jury's minority composition is ultimately "either slightly higher or slightly lower" than the venire's, such statistics are "probative" although not necessarily "dispositive" of a lack of discriminatory intent].)

Second, defendant argues that the prosecutor's stated reason for excusing each of the three prospective jurors — their "inability to impose the death penalty" — is belied by the record. He further argues that the prosecutor's initial reluctance to explain the reasons for his challenges is "suspect." If the prosecutor "had valid, race-neutral reasons for challenging each of the jurors," defendant argues, "then logically it would create no problem for him to justify those challenges in a succinct statement to the court."

As an initial matter, the prosecutor was not obliged to state his reasons for challenging any prospective juror because the trial court concluded that defendant had not made a prima facie case of discrimination. (*People v. Carasi* (2008) 44

Cal.4th 1263, 1292.) Thus, there is nothing suspect about any reluctance the prosecutor may have had to state his reasons.

In any event, the trial court's conclusion that defendant did not carry his burden of demonstrating that the prosecutor acted with discriminatory intent is supported by substantial evidence. The prosecutor offered valid race-neutral reasons for excusing each of the three prospective jurors. All three prospective jurors answered the written questionnaire in a manner that suggested a significant degree of confusion or hesitation regarding their ability to impose the death penalty. Prospective Juror J.R. circled both "yes" and "no" in response to question 31(f) of the questionnaire, which asked: "Regardless of your views on the death penalty, would you as a juror, be able to vote for the death penalty on another person if you believe after hearing all the evidence, that the penalty was appropriate?" During voir dire, J.R. explained that the question "didn't have an 'I don't know' so I put a yes and no." When asked if "don't know" was her answer, J.R. stated, "Well, I understood it, but my answer to that is I don't know anything much about the death penalty." Similarly, J.R. selected "don't know" in answer to questions 33 and 34. Question 33 asked, "In this penalty phase would you automatically, in every case, regardless of the evidence, vote for life in prison without the possibility of parole?" And question 34 asked, "Do you have any conscientious objections to the death penalty which you believe *might impair* your ability to be fair and impartial in a case in which the prosecution is seeking the death penalty?"

Prospective Juror R.W. responded to question 30 of the questionnaire by writing: "I have never given a serious thought to the death penalty I would have to say I honestly don't know if I could vote on putting some one to death." Question 31(e) of the questionnaire asked, "Do you feel California should have the death penalty?" to which Prospective Juror R.W. responded, "I don't know. I don't see it

35

as a way to stop crime because we don't kill everybody who commits a crime." She also wrote, in answer to a later question: "I don't know what the purpose [of the death penalty] is because it still doesn't stop crime!" In response to question 34, she selected "don't know" as to whether she had any conscientious objections to the death penalty. During voir dire, when questioned by the court about her answers to these questions, R.W. twice stated only that she "th[ought]" she would be able to impose the death penalty if she found the aggravating factors to outweigh the mitigating factors.

Prospective Juror A.I.'s written and oral answers also revealed that she had qualms about the death penalty and wasn't sure she could serve as an impartial juror because of defendant's age. In response to question 33, A.I. selected, "don't know." When asked at voir dire if she could "think of any reason [she] would tend to favor one side or the other," A.I. hesitated to answer and then at the court's urging replied, "I don't know. He seems very young. I might hesitate." Prospective Juror A.I. also told the trial court that she would have difficulty looking at pictures of "autopsies" and the "murder scene."

Defendant correctly observes that none of these three prospective jurors would have been excusable for cause because each expressed a willingness to follow the law if selected for the jury. However, "[a] prosecutor's reasons for exercising a peremptory challenge 'need not rise to the level justifying exercise of a challenge for cause.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 901 (*Hamilton*).) "Moreover, even when jurors have expressed neutrality on the death penalty, 'neither the prosecutor nor the trial court [i]s required to take the jurors' answers at face value.' [Citation.] If other statements or attitudes suggest that the juror has 'reservations or scruples' about imposing the death penalty, this demonstrated reluctance is a race-neutral reason that can justify a peremptory

36

challenge, even if it would not be sufficient to support a challenge for cause." (*People v. Lomax* (2010) 49 Cal.4th 530, 572.)

In sum, substantial evidence supports the trial court's determination that the prosecutor's strikes of Prospective Jurors J.R., R.W., and A.I. were motivated by the answers on their juror questionnaires indicating ambivalence about the death penalty. Our determination is additionally supported by the fact that at the time defendant made his *Batson* motion, the jury's racial composition exactly matched the venire's and by the fact that half of the jurors ultimately seated were black, a higher ratio than in the venire. This is a significant " 'indication of the prosecution's good faith in exercising his peremptories.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 236; see *Cleveland*, *supra*, 32 Cal.4th at p. 734.)

For the first time on appeal, defendant identifies over two dozen unchallenged prospective jurors, three of whom ultimately served on the jury, who circled at least one "don't know" answer to questions 32, 33, and 34. Assuming that defendant has not forfeited this argument by waiting until his reply brief to raise it, the comparative juror analysis he urges does not demonstrate that the strikes at issue were based on the jurors' race.

First, the answers of the prospective jurors who never made it into the jury box are irrelevant because they do not prove that the prosecutor would have accepted such jurors. Nor is it relevant whether a prospective juror circled "don't know" with respect to question 32, which asked whether a juror would always vote to *impose* the death penalty.

Second, with respect to the three jurors who ultimately served on the jury, none circled "don't know" in answer to *both* questions 33 and 34, and none took the step of indicating uncertainty in response to question 31(f), as Prospective Juror J.R. did. None wrote explicit comments akin to R.W.'s indicating that he or she doubted the efficacy of the death penalty, nor did any give repeated equivocal

37

answers akin to R.W.'s at voir dire. To the contrary, each of the three seated jurors indicated strong support for the death penalty and a clear willingness to impose such a sentence in both their juror questionnaires and their voir dire. Similarly, none came close to demonstrating the type of reservations expressed by A.I. about imposing the death sentence on this particular defendant because of his youthful appearance.

Third, the trial court had the opportunity to see the demeanor of all of the relevant jurors, and it stated on the record that the challenged jurors had demonstrated more reluctance to impose the death penalty than other jurors whom the prosecution did not challenge. Thus, even considering the comparative juror analysis urged by defendant, substantial evidence supported the trial court's determination that the prosecutor's peremptory challenges against Jurors J.R., R.W., and A.I. were proper.

2. *Whether Defendant Was Properly Convicted of Willful, Deliberate, and Premeditated Attempted Murder of Latasha W.*

Defendant argues that the trial court erred by permitting the jury to convict him of the willful, deliberate, and premeditated attempted murder of Latasha W., a crime with which he was not expressly charged in the indictment. We do not decide whether defendant consented to be tried for willful, deliberate, and premeditated attempted murder because we agree with defendant that the jury was not properly instructed on the meaning of the terms "willful," "deliberate," and "premeditated" in any event. We therefore order a reduction of defendant's conviction on count 2 to a conviction for regular attempted murder. We conditionally impose a lower term sentence on that count, but permit the prosecution to seek resentencing should it wish to do so.

38

### a) *Factual Background*

In count 2 of the indictment, defendant was charged with attempted murder, in violation of Penal Code, sections 664 and 187, subdivision (a). Count 2 alleged that "On or about July 1, 1996, in the County of Los Angeles, the crime of attempted murder, in violation of Penal Code section 664/187(A), a felony, was committed by [defendant], who did willfully, unlawfully and with malice aforethought attempt to murder Latasha [W.], a human being." (Some capitalization omitted.) The indictment did not allege that the attempted murder was "deliberate" or "premeditated." That omission is significant because the sentence for regular attempted murder is a determinate term of "five, seven, or nine years" of imprisonment. (§ 664, subd. (a).) The sentence for attempted "willful, deliberate, and premeditated murder," by contrast, is "life with the possibility of parole." (*Ibid.*)

Nor was the jury instructed on a theory of attempted willful, deliberate, and premeditated murder. When discussing CALJIC No. 8.20, which is the instruction regarding the definitions of the terms "willful," "deliberate," and "premeditated," in the context of one of the first degree murder charges, the parties informed the court that they had agreed that the instruction would be given only with respect to the Michael Haney murder, of which defendant was acquitted. The parties did not discuss giving CALJIC No. 8.67, the analogous instruction pertaining to willful, deliberate, and premeditated attempted murder, with respect to count 2. When orally instructing the jury regarding the elements of count 2, the trial court described the count only as alleging "attempted murder." The court said nothing suggesting that defendant was charged with attempted willful, deliberate, and premeditated murder of Latasha W., and it did not give CALJIC No. 8.67 or otherwise define those terms with respect to count 2.

39

The court did define the terms "deliberate" and "premeditated" when it read CALJIC No. 8.20 to the jury in connection with count 7, the Haney murder. Immediately before doing so, however, the court explicitly told the jury that the instruction "applies to the Haney homicide charge only." The word "HANEY" is handwritten at the top of the copy of CALJIC No. 8.20 that was given to the jury.

Nonetheless, during closing argument the prosecution asserted that defendant's actions demonstrated that defendant's attempt to kill Latasha W. was willful, deliberate, and premeditated. The prosecution had argued a similar theory to the grand jury when securing the indictment.

There was no discussion between the parties and the court regarding the jury verdict form for count 2. That form first asked the jury to find whether defendant attempted to murder Latasha W. It then asked the jury to find true or not true the allegation that the attempted murder was "willful, deliberate and premeditated." The jury found the allegation to be true.

### b) Analysis

Defendant contends that because he was not charged in the indictment with willful, deliberate, and premeditated attempted murder, it was statutory and constitutional error for the court to permit the jury to consider whether he acted with deliberation and premeditation and then to sentence him on that basis rather than for having committed regular attempted murder. Alternatively, he says that the trial court's failure to instruct the jury on the meanings of "willful," "deliberate," and "premeditated" deprived him of his right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution. He therefore urges that his life sentence on count 2 for attempted willful, deliberate, and premeditated murder be reduced to a determinate sentence for regular attempted murder.

40

The Attorney General responds that defendant forfeited his claim that he was not properly charged in the indictment by failing to raise it at trial. Alternately, defendant impliedly consented to being tried with that enhancement by not objecting to the jury verdict form. The Attorney General also argues that the indictment reflects a mere "technical inadequacy" because defendant was on notice of the prosecution's intent to charge him with willful, deliberate, and premeditated murder, both because count 2 alleged that defendant acted "willfully" and because the grand jury transcript revealed the prosecutor's theory. As to the trial court's failure to properly instruct the jury, the Attorney General concedes the error but argues that the error was harmless beyond a reasonable doubt.

Because we find that the trial court prejudicially erred in failing to instruct the jury on the meanings of "willful," "deliberate," and "premeditated," we do not address whether defendant consented to having those allegations placed before the jury. Assuming without deciding that defendant was properly charged with willful, deliberate, and premeditated murder, the trial court was required to instruct the jury on what those terms mean. The willful, deliberate, and premeditated nature of an attempted murder is " 'the functional equivalent of an element' " of the offense insofar as it increases the punishment for an attempted murder. (*People v. Seel* (2004) 34 Cal.4th 535, 548.) As such, it must be submitted to a jury and proved beyond reasonable doubt. (*Id.* at p. 549; see *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)

In turn, because the willful, deliberate, and premeditated nature of an attempted murder is the functional equivalent of an element of the offense, the trial court was required to instruct the jury on those elements even though defendant did not request such an instruction. (See, e.g., *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 ["It is settled that, even in the absence of a request, a trial court must

41

instruct on general principles of law that are commonly or closely connected to the facts before the court and that are necessary for the jury's understanding of the case."].)  Thus, the trial court erred in permitting the jury to consider the charge of attempted willful, deliberate, and premeditated murder without a proper instruction on what those terms mean.

The failure to instruct the jury on an element of an offense is federal constitutional error because it violates the defendant's due process and Sixth Amendment rights to have a jury adjudicate guilt beyond a reasonable doubt. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 662–663; *People v. Bolden* (2002) 29 Cal.4th 515, 560.)  Such error is "harmless only if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error."  (*Bolden*, at p. 560; see *Gonzalez*, at p. 663; *Chapman v. California* (1967) 386 U.S. 18, 24.)

On the facts here, we cannot be certain beyond a reasonable doubt that the jury would have found defendant guilty of attempted willful, deliberate, and premeditated murder had it been properly instructed.  In order to find defendant guilty of that charge, the jury would have had to conclude that his acts were the result of " ' " 'careful thought and weighing of considerations' " ' " rather than an " ' "unconsidered or rash impulse." ' "  (*People v. Manriquez* (2005) 37 Cal.4th 547, 577 (*Manriquez*); see *People v. Anderson* (1968) 70 Cal.2d 15, 26–27; see also CALJIC No. 8.67.)  That standard is not met by showing only that a defendant acted willfully and with specific intent to kill.  "By conjoining the words 'willful, deliberate, *and* premeditated' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a

42

specific intent to kill." (*People v. Thomas* (1945) 25 Cal.2d 880, 900, italics added.)

Latasha W. testified that defendant shot Coleman in the head at point-blank range shortly after entering Coleman's house and again before departing. But defendant did not take equally deliberate steps toward killing Latasha W. Instead, one of his confederates tied her up with a telephone cord. Then, only as defendant was on the verge of leaving the house, did he fire a shot at Latasha W. that grazed her ear. No doubt there is sufficient evidence from which a rational factfinder could infer that defendant acted with deliberation and premeditation. But the pertinent question here is whether there is no reasonable possibility that the jury could have concluded otherwise had it been properly instructed. The manner in which defendant shot Coleman and later, for good measure, shot him a second time plainly indicates that defendant killed him with deliberation and premeditation. But the manner in which defendant shot at Latasha W., while sufficient to support a finding of intent to kill, does not necessarily compel a finding that defendant fired the single shot at her as a result of " ' "careful thought and weighing of considerations" ' " as opposed to an " ' " 'unconsidered or rash impulse' " ' " just before exiting the home as his two accomplices waited outside. (*Manriquez, supra*, 37 Cal.4th at p. 577.) On these facts, we cannot say it would have been unreasonable for the jury, had it been properly instructed, not to find deliberation and premeditation.

The Attorney General's argument that the jury likely relied upon the definition of the terms "willful," "deliberate," and "premeditated" contained in the instructions regarding the murder of Haney is not persuasive. The court specifically instructed the jury to consider that instruction as "to the Haney homicide charge *only*." (Italics added.) We "presume the jury followed the court's instructions." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 172.)

43

Furthermore, because the jury found defendant not guilty of the Haney murder, in which defendant was charged with both first degree and second degree murder, the jury would have had little cause to consider what the critical terms "deliberate" and "premeditated" mean in connection with that charge. Thus, when the jury was deliberating on the attempted murder charge, the *only* instructions it likely would have considered are the ones the court gave regarding regular attempted murder, which did not explain the standard for a finding of deliberation and premeditation.

The Attorney General is similarly unpersuasive in her contention that the court's instructional error was harmless because the jury verdict form told the jurors that they should only find willfulness, deliberation, and premeditation if they could do so beyond a reasonable doubt. This contention simply begs the question as to what legal question the jury thought it was answering.

Because the instructional error with respect to count 2 was not harmless beyond a reasonable doubt, we reverse the penalty enhancement under section 664, subdivision (a) for "willful, deliberate, and premeditated" attempted murder. Defendant's conviction for attempted murder remains intact.

Rather than remand for resentencing on the attempted murder conviction, we impose the lower term sentence of five years and permit the prosecution to request resentencing before the superior court within 60 days after the filing of our remittitur should it choose to do so. We recently followed the same approach in *People v. Boyce* (July 24, 2014, S092240) __ Cal.4th __. There, as here, we found an error that affected the noncapital portion of the sentence imposed upon a capital defendant. Recognizing that the length of the noncapital sentence would "have little practical significance given our affirmance of the special circumstances and death sentence" and that there is considerable "time and expense involved in resentencing a capital prisoner" (*id*. at p. ___ [p. 73]), we imposed the lower term sentence but permitted the prosecution to request resentencing (*id.* at pp. __, __

44

[pp. 73, 76]). Here, the trial court imposed the mandatory sentence of life without the possibility of parole for a conviction of attempted willful, deliberate, and premeditated murder. The trial court therefore had no chance to consider what sentence would be appropriate for a conviction of regular attempted murder. Because we do not know what sentence the trial court would have imposed had it had a chance to consider the proper term, we follow the same approach we adopted in *Boyce*.

Our disposition is without prejudice to the prosecution retrying defendant for the willful, deliberate, and premeditated murder of Latasha W. if doing so is consistent with statutory and constitutional double jeopardy principles, a question that was not briefed and that we do not address.

### 3. *Sufficiency of the Evidence that the Foster Homicide was Committed in the Course of an Attempted Robbery*

Defendant contends that there is insufficient evidence to sustain the finding that he harbored the specific intent to steal from Charles Foster, the victim who was shot at the ATM. If correct, defendant's argument would require us to vacate defendant's convictions on count 9 (robbery of Foster) and count 8 (first degree murder of Foster on a felony-murder theory). We conclude that the jury could have reasonably inferred the elements of an attempted robbery from the totality of the circumstances. Therefore, there is sufficient evidence to sustain the convictions on both counts.

### a) *Background*

The evidence showed that at 1:13 a.m. on July 26, 1996, Foster walked up to an ATM while Yvonne McGill and Sandra Johnson waited 12 feet away in a parked truck. At 1:23 a.m., defendant approached the passenger side of the truck and pointed a handgun at McGill. As Johnson and McGill drove away, defendant turned and approached Foster at the ATM.

45

The prosecution introduced a videotape of time-lapse photographs from two cameras on either side of the ATM. The videotape provides a time-stamped account of the moments leading to Foster's death. The events recorded on the videotape are as follows.

After Johnson and McGill drove away, defendant stood immediately behind Foster for 25 seconds before he raised his gun to fire the fatal shots. At one point during those 25 seconds, defendant placed a hand on Foster's arm while brandishing his gun. Thereafter, Foster turned to face the ATM while defendant observed with his gun at his side. For the next 11 seconds, Foster was partially turned toward defendant. Then, without any further physical contact or gesturing, defendant raised his gun and, with Foster then facing him, shot Foster.

### b) Analysis

In reviewing a challenge to the sufficiency of the evidence, we "review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) Moreover, " ' "[c]ircumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Accordingly, "[w]e 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' " (*Zamudio*, at p. 357.)

46

Defendant contends that the mere fact that the homicide occurred at an ATM is insufficient evidence to infer he had the specific intent to steal. He says there is no evidence that he demanded or reached for any of Foster's property either before or after the shooting. Thus, he contends, inferring the specific intent element of robbery is entirely speculative.

We disagree. Time-lapse photographs from two cameras show defendant interacting with Foster for approximately 25 seconds before raising his gun to fire. During that time, defendant touched Foster's arm, brandished his gun, and stood by as Foster attempted to use the ATM. A trier of fact could reasonably infer from the totality of these circumstances that defendant had the specific intent to steal from Foster. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1129–1130 [jury's finding of an attempted robbery sufficiently evidenced by the totality of circumstances, even though attackers had not specifically demanded money or drugs], citing *People v. Gilbert* (1963) 214 Cal.App.2d 566, 567−568 ["where two armed men appeared in market shortly after closing time and simultaneously displayed their weapons," lack of phrases such as " 'hand over your money' " does not bar the reasonable inference that a forceful taking of property was intended"].) (*Rodrigues*, at pp. 1129-1130.) For example, the jury could have reasonably inferred that defendant intended to rob Foster but fled after shooting him, knowing that Johnson and McGill would be summoning the police. (See *People v. Zapien* (1993) 4 Cal.4th 929, 984 [affirming a jury's reasonable inference that the defendant fled without completing the robbery because he knew someone had telephoned the police].) Alternatively, the jury could have reasonably found that defendant shot Foster because Foster refused to give him money, as evidenced by the possible argument between the two men, or because defendant realized that, having failed to use the ATM, Foster likely had no money to steal. (Cf. *People v. Carroll* (1970) 1 Cal.3d 581, 584−585 [finding that robbery and shooting of victim

47

constituted one indivisible transaction where defendant shot the victim after becoming angry when the victim turned out to have no money].)

Because the " 'circumstances reasonably justify the trier of fact's findings' " that defendant attempted to steal money from Foster, reversal of the convictions on counts 8 and 9 is unwarranted. (*People v. Thomas*, *supra*, 2 Cal.4th at p. 514.) For the same reason, substantial evidence supports the jury's true finding on the special circumstance allegation that the murder was committed during the commission of an attempted robbery.

4. *Instruction on Second Degree Murder as Lesser Included Offense*

Defendant contends the trial court committed error under California law by failing to instruct the jury sua sponte on second degree murder as a lesser included offense of the felony murder of Foster charged in count 8 of the indictment. We agree but find the error harmless. We reject defendant's related argument that the failure to instruct on second degree murder violated his federal constitutional rights under *Beck v. Alabama* (1980) 447 U.S. 625 (*Beck*).

*a) Background*

Count 8 charged that defendant "did willfully, unlawfully, and with malice aforethought murder Charles Foster, a human being." It further alleged that the murder occurred while defendant "was engaged in the commission of the crime of attempted robbery, within the meaning of Penal Code section 190.2(a)(17)."

When discussing the jury instructions, the prosecution informed the court that it intended to proceed only on a felony-murder theory with respect to count 8 instead of arguing a first degree premeditated malice murder theory as well. The following colloquy then occurred between the court and defense counsel:

"[The Court:] [The prosecution] is asking for felony murder only on the last of the homicides over at the A.T.M. [¶] This will be more up to the defense, it

would seem to me . . . . [¶] I think a logical inference to be drawn is that the fellow was killed at the A.T.M. to try to get money. [¶] But that is not necessarily the only inference. [¶] You have some evidence, how strong it is is up to the jury, but you have evidence of some sort of an argument taking place, verbal argument. And the only thing there to suggest a robbery is the fact that the guy is at the A.T.M. window. [¶] You have no words of demand or property taken as far as we know.

"[Prosecutor]: Well, he walked up on him with a shirt wrapped around his head to conceal his identity.

"The Court: And then shot him in the head and walked away. [¶] The eyewitnesses say nothing about the logical thing happening and the guy goes to the wallet.

"[Prosecutor]: That's true.

"The Court: I mean it — [¶] I think I probably know what happened. Most people die at ATM's, it is probably a robbery. But here you have evidence that something else could have been going on. [¶] Some sort of fight. I don't know. [¶] Anyway, on that one, if they want to go felony murder only, what do you want to do on that? [¶] First or second on that one?

"[Defense counsel]: No.

"The Court: Felony murder only?

"[Defense counsel]: Yes.

"The Court: Fair enough."

Defense counsel then asked the court if it would also be willing to instruct on manslaughter as a lesser included offense if defendant agreed to the jury being instructed on second degree murder. The court rejected defense counsel's proposal because "[t]here is nothing to reduce this to a manslaughter. No way,

49

shape or form." Defense counsel did not then request a second degree murder instruction with respect to count 8.

The jury was instructed that it could find defendant guilty of murder only on a felony-murder theory on count 8. The jury found defendant guilty of count 8 and found true the allegation that the murder was committed in the course of an attempted robbery. As noted, the jury also found defendant guilty of count 9, attempted robbery of Foster.

### b) Analysis

Defendant argues that the court should have instructed the jury on second degree murder as a lesser included offense with respect to count 8, even though defense counsel declined to request such an instruction when invited to do so. Defendant's primary argument is not that second degree murder is always a lesser included offense of felony murder. Rather, he argues that second degree murder is a lesser included offense of count 8 as charged in the indictment.

The Attorney General does not respond directly to defendant's argument that second degree murder is a lesser included offense of felony murder as charged in count 8. Instead, she contends that second degree murder is not a lesser included offense of felony murder as a general matter because felony murder does not require the prosecution to prove malice, a key element of second degree murder. In the alternative, the Attorney General argues that there was insufficient evidence to support a second degree murder instruction on these facts because defendant did not introduce evidence to support a theory that the shooting of Foster was perpetrated for any reason other than robbery. Finally, the Attorney General argues that even if there was instructional error, such error was harmless.

50

The Attorney General does not argue that defendant invited any error by declining the trial court's offer to instruct on second degree murder. We therefore do not address whether counsel's conduct amounted to invited error.

" ' " '[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 115 (*Valdez*).)

The rule that juries must be instructed on lesser included offenses " 'prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence merits." ' " (*People v. Smith* (2013) 57 Cal.4th 232, 239–240 (*Smith*).) Because instructing on lesser included offenses serves to increase the accuracy of verdicts, the requirement to do so applies " 'even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.' [Citation.]" (*Valdez*, *supra*, 32 Cal.4th at p. 115.)

"On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113 (*Souza*).) "For purposes of determining a trial court's instructional duties, we have said that 'a lesser offense is necessarily included in a

51

greater offense if either the statutory elements of the greater offense, *or the facts actually alleged in the accusatory pleading*, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*Smith*, *supra*, 57 Cal.4th at p. 240, italics added.) When applying the accusatory pleading test, "[t]he trial court need only examine the accusatory pleading." (*Id*. at p. 244.) "[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense." (*Ibid.*)

Here, under the accusatory pleading test, second degree murder was plainly a lesser included offense of felony murder *as charged* in count 8. Count 8 charged defendant with willfully killing Foster with malice aforethought. " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 623 (*Taylor*).) Thus, it is evident that second degree murder was a lesser included offense of felony murder as charged in count 8, which alleged not merely that defendant killed in the course of a robbery but that he did so willfully and maliciously. Accordingly, the trial court was required to instruct the jury on second degree murder so long as substantial evidence would have supported such a finding. We therefore need not and do not reach the question raised by the Attorney General of whether second degree murder is a lesser included offense of felony murder under the statutory elements test.

The evidence of second degree murder in the Foster shooting, though not particularly strong, was sufficient to obligate the trial court to instruct on second degree murder. The "substantial evidence requirement is not satisfied by ' "*any*

evidence . . . no matter how weak" ' but rather by evidence from which a reasonable jury could conclude 'that the lesser offense, but not the greater, was committed.' " (*People v. Avila* (2009) 46 Cal.4th 680, 705.)  The ATM video and witness testimony in this case established that a gunman approached Foster at the ATM.  The two engaged in some sort of discussion (perhaps an argument), and Foster turned toward the ATM before being shot.  As noted, this evidence was sufficient for the jury to infer that defendant was attempting to commit robbery.  However, Manzanares testified that Foster and the gunman were arguing, and there was no evidence that defendant took any property or money from Foster after the shooting.  As the trial court observed, "I think a logical inference to be drawn is that the fellow was killed at the A.T.M. to try to get money.  [¶] But that is not necessarily the only inference.  [¶] You have some evidence, how strong it is is up to the jury, but you have evidence of some sort of an argument taking place, verbal argument."  Thus, the evidence permitted the inference that defendant shot Foster with malice in the course of an argument or fight, not necessarily in the course of a robbery.  Because the evidence was sufficient to support a theory of second degree murder, the trial court should have instructed the jury on that theory.

We nonetheless find the error harmless.  Our precedent holds that an erroneous failure to instruct the jury on a lesser included offense is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 837, and that evidence sufficient to warrant an instruction on a lesser included offense does not necessarily amount to evidence sufficient to create a reasonable probability of a different outcome had the instruction been given.  (See *People v. Beames* (2007) 40 Cal.4th 907, 970–971; *People v. Breverman* (1998) 19 Cal.4th 142, 176.)  Here, there is no reasonable probability that the evidence of an argument between defendant and Foster, minimal as it was, would have led the jury, had it been

53

properly instructed, to conclude that defendant shot Foster at the ATM out of malice unrelated to any robbery. As the trial court observed, even though there was "some evidence" otherwise, the far more plausible inference is that the "fellow was killed at the A.T.M. to try to get money." Thus, the trial court's failure to instruct on second degree murder was harmless.

Defendant's reliance on *Beck*, *supra*, 447 U.S. 625 for the proposition that the failure to instruct on second degree murder violated the United States Constitution is unavailing under our precedents. After *Hopkins v. Reeves* (1998) 524 U.S. 88, we have repeatedly rejected *Beck* claims in light of the differences between California's death penalty scheme and the Alabama scheme at issue in *Beck*. (See *Taylor*, *supra*, 48 Cal.4th at p. 625; *People v. Wilson* (2008) 43 Cal.4th 1, 17–18; *People v. Rundle* (2008) 43 Cal.4th 76, 143, disapproved of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Prince* (2007) 40 Cal.4th 1179, 1268–1269; *Valdez*, *supra*, 32 Cal.4th at pp. 118–119; *People v. Waidla* (2000) 22 Cal.4th 690, 736, fn. 15.)

5. *Hearsay*

Defendant next contends the trial court violated his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and analogous provisions of the state Constitution by admitting Officer Martinez's testimony recounting what Latasha W. had told him about the events at the Coleman residence. As explained below, the trial court did not abuse its discretion in allowing the evidence to be introduced under the spontaneous declaration exception to the hearsay rule.

a) *Background*

Officer Martinez testified about statements Latasha W. made in the two-hour period of time following the events that occurred at the Coleman residence.

54

Officer Martinez first encountered Latasha W. at approximately 3:00 a.m. as she was "running in the middle of the street yelling frantically . . . in hysterics . . . crying." In response to defense questioning, Officer Martinez also testified that "over the course of the two hours [Latasha W.] was able to calmly relate descriptions and things that went on in the house" in "a chronological time and sequence of events. However, by the end of the two hours, she was "shocked still" and was crying and shaking from the ordeal. Concluding that the prosecution had established that Latasha W.'s statements were excited utterances or spontaneous declarations, the trial court overruled four hearsay objections to Officer Martinez's testimony.

### b) Analysis

Under the spontaneous declaration hearsay exception, hearsay testimony is admissible if it "(a) [p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) [w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).) "When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] But . . . '[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the

statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' " (*Id.* at p. 319.) "Under the same reasoning, the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity." (*Ibid.*)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.]" (*Poggi*, *supra*, 45 Cal.3d at p. 318.) Thus, if supported by substantial evidence, we must uphold the trial court's determination of preliminary facts. (*People v. Brown* (2003) 31 Cal.4th 518, 541.)

Defendant argues that Latasha W.'s statement to Officer Martinez did not meet the second *Poggi* requirement, i.e., the declaration was not made while Latasha W.'s reflective powers remained in abeyance. We disagree. When Officer Martinez first encountered Latasha W., after she had run from Coleman's residence, she was "crying," "flinging her arms [and] screaming loud[ly]," "[f]rightened," "[h]ysterical," "[v]ery emotional," and "[s]peaking very rapidly." At the end of the approximately two hours she spent with Officer Martinez, Latasha W. "was shocked . . . [a]nd still shaking by the ordeal." Thus, the trial court did not abuse its discretion in finding that the two-hour period of time during which Latasha W. made her statements did not deprive them of their spontaneity. (See, e.g., *People v. Brown*, *supra*, 31 Cal.4th at p. 541 [statements made two and one-half hours after event held spontaneous where "the declarant continued to labor mightily under the emotional influence of the disturbing events he perceived, so much so that he could not stop his body from shaking nor stem the flow of tears"].)

Defendant relies on *People v. Lynch* (2010) 50 Cal.4th 693, where we held that a victim's statements made approximately two hours after she was attacked

56

were not spontaneous utterances. (*Id.* at p. 754.) But the "[m]ost critical[]" reason for our holding was that there was "no testimony . . . demonstrat[ing] that . . . [the victim] was excited or frightened as she spoke, or that her physical condition at the time of her statements precluded deliberation." (*Ibid.*) Here, there was significant evidence that Latasha W. was still emotionally distraught throughout her conversation with Officer Martinez. (See *Poggi*, *supra*, 45 Cal.3d at p. 319 ["[T]he fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity."].)

Finally, "the fact that the statements were delivered in response to questioning does not render them nonspontaneous." (*Poggi*, *supra*, 45 Cal.3d at pp. 319–320.) Nothing in the record suggests that Officer Martinez's questions throughout the ensuing two hours were anything but routine and nonsuggestive inquiries. Thus, substantial evidence supports the trial court's determination that all of Latasha W.'s statements to Officer Martinez were "made under the stress of excitement and while the reflective powers were still in abeyance." (*Id.* at p. 319, italics omitted.)

### 6. *Latasha W.'s Redirect Testimony*

Defendant argues that the trial court erred in admitting Latasha W.'s redirect testimony that her friendship with Coleman was based upon his having served as her protector after she was raped by a different individual on a prior occasion. Defendant is incorrect. This testimony was admissible because it was relevant to rebutting defense counsel's attack on Latasha W.'s credibility.

#### a) *Background*

In response to defense counsel's cross-examination, Latasha W. testified that she was aware that Coleman was a drug dealer and a gang member. She also testified that she had previously spent the night at Coleman's house. On redirect,

the prosecutor asked Latasha W. about the nature of her relationship with Coleman. Latasha W. explained that he was her best friend but not her boyfriend. Over defense objection, she further testified that the basis for their close friendship was that Latasha W. had previously been raped by another individual who had continued to harass her. Coleman had threatened that individual, successfully ending that individual's harassing behavior. And in response to a prosecution question about her having spent the night at Coleman's house, Latasha W. explained that on one occasion she had gone to the house with her sister and stayed overnight when the hour became late.

### b)  Analysis

Defendant argues that the testimony about Latasha W.'s prior rape and the story of her having spent the night at Coleman's house should have been excluded both as irrelevant and as impermissible victim impact testimony. As an initial matter, we reject the Attorney General's argument that defendant forfeited his claim that the testimony was impermissible victim impact testimony. Defendant objected that the testimony was irrelevant. Labeling the objection "impermissible victim impact testimony" does not affect whether the evidence in question is relevant or more probative than prejudicial. (See *People v. Redd* (2010) 48 Cal.4th 691, 731, fn. 20.) The substance of the objection is that the testimony in question, which happens to pertain to victim impact, is not relevant to or sufficiently probative of any disputed fact during the guilt phase. "[T]he proposition that the admission of irrelevant victim-impact evidence constitutes an error" is no "different from the admission of any other irrelevant evidence. Thus, defendant's 'relevance' objection preserved his [claim that the evidence was irrelevant victim impact evidence]." (*Ibid.*) Thus, defendant's claim that the

58

testimony constituted impermissible guilt phase victim impact testimony is simply an objection that the testimony was irrelevant or more prejudicial than probative.

Nor is there merit to the Attorney General's contention that defendant forfeited his argument that the story about spending the night at Coleman's house was irrelevant. Defense counsel had already lodged an objection to the line of questions about Latasha W.'s relationship with Coleman, and it was not incumbent upon defense counsel to disrupt the trial by continuing to object to each subsequent question in order to preserve the objection.

On the merits, defendant's claims fail. " ' "It is well settled that when a witness is questioned on cross-examination as to matters relevant to the subject of the direct examination but not elicited on that examination, he [or she] may be examined on redirect as to such new matter." ' [Citation.] ' "The extent of the redirect examination of a witness is largely within the discretion of the trial court." ' " (*Hamilton*, *supra*, 45 Cal.4th at p. 921.) Here, defense counsel elicited information that Latasha W. was best friends with Coleman despite knowing him to be a drug dealer and a gang member. That testimony served little purpose other than to impeach Latasha W.'s credibility by impliedly connecting her to Coleman's illicit activities. We discern no abuse of discretion in the trial court having permitted the prosecutor to establish that the basis for Coleman's and Latasha W.'s friendship was not gang or drug related. Because the testimony was admissible, there is no merit to defendant's further argument that admission of the testimony violated his right to due process.

### 7. *Confrontation Clause*

Defendant contends that Dr. Cotton's testimony about the DNA sample taken from Latasha W. denied him his Sixth Amendment right to confront the witnesses against him because Dr. Cotton relied on DNA testing done by other

individuals who did not testify. We do not decide the merits of this issue because any error was harmless in light of the fact that Dr. Cotton testified about her own independent scientific conclusions. This unrebutted testimony, which did not violate defendant's rights under the confrontation clause, convincingly established that defendant's DNA matched that of Latasha W.'s assailant.

### a) Background

Dr. Cotton testified that analysts at her laboratory performed DNA tests on the vaginal swab taken from Latasha W. that was sent to Cellmark. She testified that based on testing at nine different DNA loci, the tests established that defendant could not be excluded as a match to the sperm portion of the swab sample and that Latasha W. could not be excluded as a match to the nonsperm portions of the sample. The statistical likelihood of any given African-American individual's DNA matching the sperm portion of the sample was one in 17 million.

Dr. Cotton explained that Cellmark's DNA tests produce a thin gel on a glass plate. Those results are then copied onto an X-ray film. Because the glass plates cannot be stored for long periods of time, the X-ray films are what are kept in Cellmark's permanent files.

Dr. Cotton testified that she reviewed the X-ray film of the tests of both the sperm and nonsperm portions of the sample taken from Latasha W. She concluded that the results were of a particularly high quality. The prosecutor then asked Dr. Cotton whether she "concur[red] with the findings [of the two Cellmark analysts who originally reviewed the DNA data] in the case." Dr. Cotton responded: "Yes. [¶] I went back and analyzed the data in preparation of coming to court so I can discuss it. And I looked at all of their interpretations and I did my own and mine are the same as theirs." The prosecution then asked: "So three

scientists have looked at this data and all are in agreement in terms of these findings?" Dr. Cotton responded that a fourth scientist had actually looked at some of the results as well, but then reiterated that in "preparation for court I had to look at the information."

b) *Analysis*

Defendant argues that Dr. Cotton's testimony regarding the laboratory results prepared by other Cellmark analysts violated his right under the Sixth Amendment to confront the witnesses against him. He relies on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny. (See *Williams v. Illinois* (2012) __ U.S. __ [132 S.Ct. 2221] (*Williams*); *Bullcoming v. New Mexico* (2011) __ U.S. __ [131 S.Ct. 2705] (*Bullcoming*); *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*).)

As an initial matter, the Attorney General is incorrect that defendant forfeited this argument by failing to object at trial. *Crawford* was decided more than five years after defendant's trial. Because *Crawford* "was a dramatic departure from prior confrontation clause case law," a defendant's failure to raise a *Crawford* claim in a pre-*Crawford* trial "is excusable because defense counsel could not reasonably have been expected to anticipate this change in the law." (*People v. Harris* (2013) 57 Cal.4th 804, 840.) Thus, defendant's *Crawford* claim is not forfeited.

As demonstrated by the passages above, Dr. Cotton's testimony can be divided into two categories. First, she testified that she had reviewed the X-ray films of the DNA results generated by Cellmark analysts and, based on her independent review of those results, concluded that defendant's DNA matched Latasha W.'s assailant's. Nothing suggests that the X-ray films, which were prepared by other Cellmark analysts, were signed or attested to under oath.

Second, Dr. Cotton testified that her conclusions were the same as those reached by the analysts who prepared the X-ray films, although no reports by those analysts were introduced into evidence.

In *Crawford*, *supra*, 541 U.S. 36, the high court held that criminal defendants have a constitutionally protected right to cross-examine any witness whose testimonial hearsay is offered against them. (See *id.* at pp. 50–56.) In a series of decisions applying *Crawford* to the introduction of scientific evidence, shifting majorities of the high court have variously defined what makes hearsay testimonial. (See *Melendez-Diaz*, *supra*, 557 U.S. at pp. 310–311 [lab analysts' affidavits describing results of testing they performed were testimonial hearsay]; *Bullcoming*, *supra*, __ U.S. at p. __ [131 S.Ct. at p. 2717] [lab analyst's certification as to his lab results, which complied with specific state laws for admission of lab reports into evidence, was testimonial hearsay]; *Williams*, *supra*, __ U.S. at p. __ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.); *id.* at p. __ [132 S.Ct. at p. 2225 (conc. opn. of Thomas, J.) [holding that an expert witness could testify based on her assumption that unsworn results received from a DNA lab were accurate, but disagreeing as to whether the unsworn nature of the data relied on by the witness or the fact that the testimony was conveyed by an expert was the reason the lab tests were not testimonial].)

Like many courts around the country, we have struggled to interpret and apply the high court's confrontation clause cases. Nonetheless, a few rules emerge from our cases. First, the introduction of machine-generated data does not implicate the confrontation clause because "unlike a person, a machine cannot be cross-examined." (*People v. Lopez* (2012) 55 Cal.4th 569, 583 (*Lopez*).) Second, an expert witness's reliance on statements or reports by other individuals that "merely record objective facts" do not implicate the confrontation clause because "[s]uch observations are not testimonial in nature." (*People v. Dungo* (2012) 55

62

Cal.4th 608, 619 (*Dungo*) [holding that a pathologist's "statements describing . . . anatomical and physiological observations about the condition" of a body upon which an autopsy was being performed were not testimonial].) Finally, we have held that a lab technician's act of initialing a report describing actions he or she has taken with respect to a particular lab test is insufficient to convert that report into a testimonial statement because initialing lacks the requisite formality, absent (at the least) a signature, certification, or other form of swearing to the truth. (*Lopez*, at pp. 584–585.)

Dr. Cotton's testimony regarding the opinions of the other analysts may have violated defendant's right to confront those analysts, although it is difficult to assess this claim because those analysts' reports are not in the record. However, any error that may have occurred would be harmless because Dr. Cotton testified that she independently reviewed the X-ray films and concluded from those films that defendant could not be excluded as a match to the sperm portion of the sample. Dr. Cotton testified as an expert witness observing objective scientific data — the X-ray film output of a DNA test. Defendant does not suggest that the X-ray films that Dr. Cotton relied on, which were not introduced into evidence, were formally attested to by the Cellmark analysts or that they conveyed anything other than objective scientific data. Thus, under *Lopez* and *Dungo*, defendant has not demonstrated that Dr. Cotton's testimony as to her own conclusions based on the X-ray films violated defendant's right to cross-examination. (See *Dungo*, *supra*, 55 Cal.4th at p. 619; *Lopez, supra*, 55 Cal.4th at pp. 570–571.) Although Dr. Cotton's testimony about her own conclusions may have been slightly bolstered by the constitutionally dubious portion of her testimony about other analysts' conclusions, any error that may have occurred was harmless beyond a reasonable doubt. Defendant was unable to seriously impeach Dr. Cotton's expert

opinion and introduced no evidence that would have led a reasonable jury to doubt Dr. Cotton's own analysis.

### 8. *Ineffective Assistance of Counsel Based on Opening Statement*

Defendant argues that his attorney rendered ineffective assistance when, during her opening statement, she referenced a partial confession defendant had made to the police that the prosecution did not plan to introduce into evidence. We need not determine whether counsel's error amounted to ineffective assistance because defendant has not demonstrated a reasonable probability that but for counsel's error, the result would have been more favorable to him. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).)

#### a) *Background*

On August 21, 1996, defendant admitted to homicide officers in a videotaped interview that he was present at the scene of the Coleman killing but denied having killed Coleman or having raped Latasha W. During her opening statement, defense counsel told the jury: "The givens are this: [¶] Mr. Banks admitted to the police when he was questioned that he was present at the Coleman murder. [¶] He denied that he was the shooter. [¶] He denied raping [Latasha W.]. [¶] But he did admit that he was present."

The prosecutor asked to approach and at sidebar informed both the court and defense counsel that he had no intention of introducing defendant's confession. Defense counsel said she assumed that the prosecutor had intended to introduce the confession. The court responded, "I don't know why they would put that in when they have what they have, including an eyewitness. [¶] Again, one way to find out rather than assuming is certainly to try to ask ahead of time."

The next day, defense counsel moved for a mistrial on grounds of her own incompetence. The trial court denied the motion, stating, "I don't see how it could

64

be incompetence to comment on what you believe the evidence will prove in the case. [¶] If you have a belief that the evidence will show a particular thing, so be it. [¶] If the people do not put that evidence on, that happens too. [¶] I say it is a better idea for counsel to wait until the people have rested to make a statement but I am not a defense attorney."

b) *Analysis*

Defendant first argues that defense counsel's conduct was so egregious as to constitute complete abandonment under the high court's decision in *United States v. Cronic* (1984) 466 U.S. 648. Under *Cronic*, if defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable," and the conviction must be reversed without further prejudice analysis. (*Id.* at p. 659.) "A complete denial of counsel at a critical stage of the proceedings" is sufficient to trigger the *Cronic* presumption of prejudice. (*People v. Benavides* (2005) 35 Cal.4th 69, 86.) "But when the defendant is represented by counsel, the [*Cronic*] presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. (*Bell v. Cone* (2002) 535 U.S. 685; *Cronic*, at p. 659.)" (*Benavides*, at p. 86.) Otherwise, "specific errors and omissions" by trial counsel must generally be litigated as ineffective assistance of counsel claims under *Strickland*. (*Cronic*, at p. 657, fn. 20.)

Here, defense counsel unwisely told the jury the evidence would show that her client admitted to being present at Coleman's house but not to shooting Coleman or raping Latasha W. When the matter was brought to her attention, she did not persist. In her closing argument, counsel reminded the jury that some of the evidence the parties discussed during their opening statements was not

65

presented and that "[w]hat we said in opening statements and what we say now is not the evidence in the case. What came from the stand is the evidence in the case." Furthermore, counsel did not concede any critical element of the Coleman murder, the robbery special circumstance, the attempted murder, or the rape charges. Thus, defendant's ineffective assistance of counsel claim must be analyzed under *Strickland* because his "argument is not that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that his counsel failed to do so at specific points." (*Bell v. Cone*, *supra*, 535 U.S. at p. 697; see *In re Avena* (1996) 12 Cal.4th 694, 727–728.)

In order to demonstrate prejudice under *Strickland*, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) Where no prejudice showing has been made, there is no need to inquire whether counsel's efforts were in fact ineffective. (*Id.* at p. 697.) Both DNA evidence and Latasha W.'s eyewitness testimony convincingly established that defendant was not only present at the scene of the Coleman shooting but that he was the person who raped Latasha W. and shot Coleman. Thus, there is no reasonable probability that defense counsel's error impacted the jury's guilty verdict with respect to any of the crimes that occurred at Coleman's home.

9. *CALJIC No. 17.41.1 — the "Juror Snitch" Instruction*

At both the guilt and penalty phases, the trial court instructed the jury in accordance with CALJIC No. 17.41.1, the now-defunct "so-called 'antijury nullification' instruction." (*People v. Rogers* (2013) 57 Cal.4th 296, 339 (*Rogers*).) The instruction provided: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or

66

expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation." (CALJIC No. 17.41.1 (6th ed. 1996).) Defendant argues that giving this instruction to the jury violated his rights to a jury trial and due process under the Sixth and Fourteenth Amendments to the federal Constitution.

We have previously rejected identical claims, and defendant provides no reason why we should reach a different conclusion here. In *People v. Engelman* (2002) 28 Cal.4th 436, 445–449, we exercised our supervisory powers to order that the anti-nullification instruction should not be given in future trials. We explained that "it is inadvisable and unnecessary for a trial court to create the risk of intrusion upon the secrecy of deliberation or of an adverse impact upon the course of deliberations by giving such an instruction." (*Id.* at p. 445.) At the same time, we said "we are not persuaded that, merely because CALJIC No. 17.41.1 might induce a juror who believes there has been juror misconduct to reveal the content of deliberations unnecessarily (or threaten to do so), the giving of the instruction constitutes a violation of the constitutional right to trial by jury or otherwise constitutes error under state law." (*Id.* at p. 444.) We have repeatedly affirmed *Engelman*'s holding that CALJIC No. 17.41.1 does not violate a defendant's right to a fair trial. (See, e.g., *Rogers*, *supra*, 57 Cal.4th at p. 340; *Souza*, *supra*, 54 Cal.4th at p. 144.) Nor did giving CALJIC No. 17.41.1 violate defendant's right to due process here, where there is no suggestion that any juror was hampered in his or her deliberation or was coerced into changing his or her views as a result of the instruction. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 656–657.)

67

10.  *Judicial Bias*

Defendant launches a multi-pronged attack on the overall fairness of his guilt phase trial, arguing that the trial court made "repeated one-sided rulings and remarks directed against defense counsel and appellant, disparaging counsel and weakening the defense's ability to present evidence countering the charges against appellant." Defendant says that these rulings and comments violated his due process right to a fair trial before an unbiased judge. However, none of the trial court's remarks in isolation or in the aggregate demonstrated bias on the part of the judge or denied defendant his right to a fair trial.

a)  *Defendant's pretrial absences*

First, defendant argues that a series of comments made by the trial judge during pretrial proceedings regarding defendant's repeated absences from those proceedings demonstrate bias. As explained below, the record reflects that throughout the pretrial proceedings defendant was taking a variety of psychiatric medications and was absent from at least six hearings or proceedings, often on account of self-inflicted injuries or suicide attempts.

On March 18, 1998, defendant was absent from a pretrial conference. Officials at the prison where defendant was housed informed the trial court that defendant said he felt ill, refused to leave his cell, and claimed that if forced to come to court, he would hurt himself or others. Defendant was on suicide watch, and defense counsel advised the court that he had attempted suicide twice during the preceding weeks. The trial court decided not to order a forcible cell extraction but told defense counsel to warn defendant that "he can't set the pace over here" and to alert him that the court might order extraction in the future. The court then proceeded to hear argument on the issues scheduled for the conference but made tentative rulings only.

Defendant was absent from another pretrial conference on April 21, 1998. The bailiff informed the trial court that defendant had "overdosed on something." The court then denied a defense motion to delay trial, which appears to have been based not on defendant's overdose but on defense counsel's needing to do "some other things . . . that I have just found out about."

On May 4, 1998, defendant was absent from yet another pretrial conference. Defense counsel informed the court that defendant had recently been hospitalized after another suicide attempt, although the bailiff informed the court that defendant was in his cell but refusing to come to court. Seemingly in response to the similarity between the judge's name (Horan) and the last name of an officer at the jail (Herran) who spoke to the bailiff, the trial court quipped, "I was working last night over there [at the jail]" and "Who else is going to think there is a conspiracy going on with Mr. Banks?"

On August 3, 1998, the day pretrial preparations were scheduled to begin, defendant was absent. The bailiff informed the court that defendant "took 20 pills and they had to pump his stomach this morning and . . . he will be listed day to day." The court stated that defendant "seems to want to come to court when he wants to come to court and when he does not, he doesn't. [¶] He either injures himself, although none of his injuries are life threatening. [¶] He comes sometimes and other times he does not. [¶] The sad fact is that we have to try this case at some point." Defense counsel told the court she was "concerned about the court's characterization. [¶] Mr. Banks is mentally ill. [¶] He is brain damaged and mentally ill and he doesn't understand and work on the same level that we do and most of the other defendants do. [¶] He has had a long, long history of suicide attempts, not just since this case has happened. [¶] He has had a long history of doing damage to himself."

"Apparently unsuccessfully," the court responded. After another brief colloquy with defense counsel, the court discussed defendant's "attempts, as you want to characterize them, I would not characterize them as suicide attempts. [¶] If a guy has been trying to kill himself his entire life, one would suspect that one would succeed. [¶] I am not trying to minimize your client's problems. I assume he has problems. But when he has a court date that he does not want to make, his so-called attempts seem to coincide with my court calendar." The court then told defense counsel to inform her client that "the court will consider his next medical problem that is self-induced to be an attempt to delay this trial." And "if the law — if I conclude that the law allows me to proceed [in defendant's absence], I will." Otherwise, "what I will do is explain to the jurors the reason for their inconvenience and use the same bunch and tell them that: 'The defendant will not come to court from jail and, therefore, folks, we have dragged you down here and will have to ask your indulgence,' because I am not going to play a game wherein we keep ordering up and have — go to the trouble of bringing 150 — I think it is 150 — people into the courtroom while we wait patiently for the defendant to feel like coming."

The next day, defendant was transported to court and made it as far as lockup. But the bailiff explained to the court that when he went to bring defendant to the courtroom, defendant told the bailiff "he needs his medication and that his jaw is locking up because he needs his medication and he needs to go and he requested paramedics." Defense counsel then informed the court that she had relayed the court's warnings to defendant and that he had told counsel that he was "starting to feel ill" and explained that "when they pumped his stomach, they give him certain medications and it locks up his jaw and it was starting — and he was starting to get dizzy and did not feel well."

70

The court stated: "It seems that while I don't doubt that the defendant may have some problems that are beyond the ability of this court to diagnose, it seems, again, that the bulk of his problems revolve around his court dates. [¶] His 'suicide attempts,' all of which have been fruitless, revolve around his court dates. [¶] His refusal to come to court on certain occasion, it has not been the matter of a suicide attempt or medication or anything else other than Mr. Banks notifying deputies at the county jail that he refuses to come in and I have not ordered a cell extraction." Counsel noted that defendant had made additional suicide attempts, not coinciding with his court dates, of which the court had not been apprised, and she requested that defendant be seen by a psychologist at the University of Southern California (USC).

The court responded that "[t]here is not a thing wrong with this fellow when he is in court. [¶] He is responsive and is like any other defendant that I have ever seen. [¶] The problem is getting him into a courtroom. [¶] Once he is in court he is controllable. [¶] Nothing will happen in this courtroom, guaranteed." After hearing argument from the prosecution, the court concluded by noting that the jury was set to arrive the following day and ordered defendant to be there. The court said that it would "contact the county jail and explain that we are going to have [defendant] here tomorrow."

The following morning, August 5, 1998, defendant was not present because, according to the bailiff, he "was saying that he is too sick to come to court." The court stated that it "spent about three hours yesterday, after counsel left, speaking to the doctors at the county jail, specifically the medical doctor who is in charge of the county jail medical system, Dr. Clark. [¶] He, at the court's request, became personally involved in the case and spoke directly to Dr. Ortego . . . at the men's central jail health staff. [¶] It is the opinion of Dr. Ortego that in spite of his suicidal gestures that Mr. Banks is not a serious threat, i.e., re suicide,

71

however, he should be watched while in transit and in the holding area to prevent delays in the trial proceedings. [¶] They are also of the opinion that he is mentally stable to start trial and that he has been medically clear and is physically able to proceed with his trial." The court then concluded that defendant's claimed medical problems the prior day were an instance of malingering.

Defense counsel expressed concern that neither doctor mentioned by the court was known to her as being the psychiatrists who were treating defendant. She requested a brief delay in proceedings to permit a USC psychiatrist to examine defendant and prescribe appropriate medication.

The court denied defense counsel's request. Some time later, after a brief recess, defendant appeared in court, having finally agreed to appear without resort to a forced extraction. The court informed defendant that if he failed to appear during the rest of the trial, the court would order forcible cell extraction and later advised defendant that if he failed to appear, the court would inform the jury that "the reason for any delay is the recalcitrance of the defendant refusing to come to court."

Finally, on August 12, 1998, proceedings began late due to a delay in getting defendant to court. The court informed the prospective alternate jurors who were present at the time that "[t]here was a problem obtaining the presence of the defendant in a timely fashion this morning. He is now here and we can go forward."

Defendant argues that these interchanges, in particular the court's skepticism about the severity of defendant's mental health situation, betrayed judicial bias that infected the whole trial. We disagree.

The record shows that the trial court was frustrated with defendant's repeated absences, and understandably so. The record also shows that the court characterized defendant's repeated attempts to harm himself (including an

72

overdose that required his stomach to be pumped) as malingering or recalcitrance, and threatened to inform the jury accordingly, without consulting a mental health expert. When the court eventually did consult a mental health professional, the court reported information from ex parte off-the-record conversations with prison medical staff without indicating whether the physicians in question were directly responsible for defendant's care. A better course would have been to conduct a hearing on the issue or to have defendant examined by a court-appointed psychiatrist, as urged by defense counsel. (Cf. *People v. Lewis* (2006) 39 Cal.4th 970, 994 [court properly concluded defendant was feigning mental incompetence where such a finding "w[as] supported by the record, including expert testimony introduced at a hearing on [the defendant's] competence"].)

Nevertheless, defendant does not argue that the court violated state or federal law in its attempts to secure defendant's attendance, or that it violated state or federal law by holding preliminary hearings in his absence or by engaging in ex parte communications with prison medical staff. His only argument is that the court's comments demonstrate bias against defendant that infected the entire trial. We do not agree that the court's skepticism as to the reasons for defendant's pretrial absence demonstrated bias toward any facet of defendant's guilt phase case, in which defendant did not assert any mental health-based defenses. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1112 ["adverse or erroneous rulings, especially those that are subject to review, do not establish a charge of judicial bias"].) Rather, the court's comments reflected frustration with the disruptions caused by defendant's repeated absences. Nothing suggests that the court developed a generally antagonistic stance toward defendant that bled into some other facet of the guilt phase trial.

Equally important, defendant does not demonstrate any way in which the court's pretrial comments impacted the jury. (See *People v. Sturm* (2006) 37

73

Cal.4th 1218, 1237 (*Sturm*) ["Trial judges 'should be exceedingly discreet in what they say and do *in the presence of a jury* lest they seem to lean toward or lend their influence to one side or the other' " (italics added)].) The only comment the court made in front of (prospective) jurors was the remark that proceedings had been delayed one morning because of a "problem obtaining the presence of the defendant in a timely fashion." But that comment did not blame defendant for the delay, nor did it indicate that the court had an unfavorable view of defendant, his mental health, or his cooperation with prison authorities. Thus, the trial court's exchanges with defendant and defense counsel regarding defendant's repeated absences and mental health did not deprive defendant of his due process right to a fair trial.

### b) *Interruption of Opening Statement*

During her opening statement, defense counsel stated: "Each homicide [of those charged] is a totally different case and you have to decide on them totally separately. [¶] They are not being charged together so you can[not] use one for the other. [¶] If a piece of evidence that you feel belongs to one or the other, that is fine. But they are three separate cases and you need to decide them individually. [¶] It is fine for you to discuss and you should — " The court interrupted: "Counsel, let me remind you that this is not an argument. [¶] That will come at the end of the case. [¶] Go ahead and make your statement."

Defendant is incorrect that the court's interruption demonstrates judicial bias. Regardless of whether the trial court was correct that there was anything improper about counsel's opening statement (a question we do not address), the trial court's intervention does not approach the type of " 'discourteous and disparaging remarks to defense counsel' " that we have found to constitute judicial misconduct. (*Sturm*, *supra*, 37 Cal.4th at p. 1223; see, e.g., *id.* at pp. 1235–1236

74

[court told counsel the line of questioning was " 'going nowhere' " and counsel was " 'not grasping my ruling,' " accused counsel of " 'trying to sneak [forbidden questions] by,' " referred to the " 'inordinate amount of time whereby objections are raised with regard to questions by [defense counsel],' " and described counsel to the jury as having " 'supposedly learn[ed] the rules of evidence' " in law school (italics omitted)].)

### c) Court's ruling on an evidentiary objection

Finally, defendant objects to the trial court's handling of the prosecution's objection to defense counsel's cross-examination of Dr. Cotton, the prosecution's DNA expert. On cross-examination, defense counsel sought to explore the fact that Dr. Cotton's lab had originally conducted the DNA test at only five loci, resulting in a one in 8,000 probability that any particular African-American might be the source of the sperm sample. A later test involving nine loci decreased the probability of a match within the African-American population to one in 17 million.

Defense counsel then asked Dr. Cotton, "So basically under the first set of testing, the prosecution indicated they didn't like the statistics." The prosecution objected "to that characterization." The court sustained the objection as follows: "Look, this is so objectionable. [¶] What the lady [Dr. Cotton] said was the following: [¶] They tested several loci and stopped, were asked to do more and said fine and kept going and kept up with their results. [¶] So please, counsel, I assume you understand and please do not ask questions that misstate the evidence in the case or that assume facts not shown by the evidence in the case. [¶] Please don't do that."

Defendant did not object to the court's comments. Shortly thereafter, and without the jury present, the trial court further criticized counsel for the question

75

she posed to Dr. Cotton.  Defense counsel defended her conduct but did not object to the court's comments to the jury or request a specific admonition with respect to them.

As to any claim that the particular remark, on its own, constituted judicial misconduct sufficient to warrant reversal, that claim is forfeited by defendant's failure to object.  A claim of pervasive judicial bias does not necessarily require an objection to be preserved because such an objection may be futile, but "[a]s a general rule," isolated "judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial."  (*Sturm*, *supra*, 37 Cal.4th at p. 1237.)  We therefore consider defendant's claim only for purposes of determining whether it demonstrated pervasive judicial bias against defendant.

A trial court must avoid making "comments implying that defense counsel was behaving unethically or in an underhanded fashion" in front of the jury. (*Sturm*, *supra*, 37 Cal.4th at p. 1241.)  Here, when defense counsel alleged that "the prosecution indicated they didn't like the statistics" from the initial test, the court properly admonished defense counsel against assuming facts not in evidence.  However, the court's remark — "They tested several loci and stopped, were asked to do more and said fine and kept going and kept up with their results. [¶] So please, counsel, I assume you understand and please do not ask questions that misstate the evidence in the case . . . ." — arguably implied that defense counsel made an allegation that she knew to be specious, when in fact there had been no evidence up to that point, one way or the other, as to why Dr. Cotton's lab had been "asked to do more."

But whether or not this particular admonition of defense counsel was improper, this isolated incident does not support defendant's claim that the trial court was pervasively biased against him.  Defendant relies primarily on *Sturm*, where we reversed a conviction due to the trial court's pervasive misconduct.

76

There, the trial court "belittled defense witnesses on several occasions" (*Sturm*, *supra*, 37 Cal.4th at p. 1233), repeatedly answered questions (once incorrectly) for a defense witness (*id.* at p. 1239), "disparaged defense counsel" on multiple occasions (*id.* at p. 1234), and "interposed [its] own objections to questions asked by defense counsel" on "numerous occasions" (*id.* at p. 1235). The trial court also compounded its behavior by admonishing the jury that it was not biased against defense counsel, but doing so in a way that implied that defense counsel did not understand the rules of evidence. (*Id.* at p. 1236). Here, by contrast, the trial court's remark did not demonstrate pervasive bias against defendant either in isolation or in combination with its pretrial comments about defendant's mental health. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1221 ["Even if improper . . . two brief remarks ' "fall short of the intemperate or biased judicial conduct [that] warrants reversal." ' "]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1107 ["A trial court commits misconduct if it '*persists* in making discourteous and disparaging remarks to a defendant's counsel . . . and utters *frequent* comment from which the jury may plainly perceive that the testimony of the witness is not believed by the judge, and in other ways discredits the cause of the defense . . . .' " (italics added)].)

In sum, defendant has not demonstrated judicial bias in the guilt phase.

### 11.    *Cumulative Error*

Defendant argues that even if any of the individual errors he believes infected his trial were harmless, the errors are prejudicial in the aggregate. The only errors we have found are the trial court's failure to instruct the jury on the penalty enhancement for deliberate and premeditated attempted murder of Latasha W., which we have corrected, and the trial court's failure to instruct on the lesser included offense of second degree murder with respect to the Foster murder,

which we have found harmless. We have also concluded that the court's pretrial remarks about defendant's mental health and its admonition in response to defense counsel's cross-examination of Dr. Cotton did not demonstrate pervasive bias. We see no basis for reversal based on cumulative prejudice.

## B.     Penalty Phase Issues

### 1.     *Exclusion of Defendant from Trial*

Defendant contends the court violated his statutory right to be present at his own trial as well as his Sixth Amendment right to cross-examine the witnesses against him by ordering him excluded from his entire penalty phase trial. In light of his egregious conduct — spitting on the judge and throwing a bag of excrement and urine in court — we conclude that the exclusion was proper and no further warnings were required beyond those given to him at the outset of trial.

### *a)     Background*

After the trial court's difficulties securing defendant's attendance at the guilt phase trial, the court admonished defendant that he was required to attend the trial and comport himself properly or else he could be excluded from the trial. The court explained to defendant that "[t]here are two situations wherein a defendant is not present during even critical portions of a death case. [¶] One is when he waives his presence voluntarily in open court . . . . [¶] The other is if the defendant becomes disruptive and has to be removed. [¶] If you, for some reason, refuse to come into the courtroom when required, which is every day, I will make a finding that you have disrupted the proceeding by your absence and/or waived your right to your presence so the case will go on even if you are not here."

During the penalty phase voir dire, as a panel of prospective jurors was exiting the courtroom, defendant began yelling at the court, "You're evil. Evil. Demon." He then flung a plastic bag full of fecal matter and urine at the court.

78

The contents of the bag wound up on the counsel tables and on the bench. According to the court, defendant said, " 'I'm done,' or 'That's it,' or some words indicating that he was not interested in fighting and he went with the bailiff into lock up."

The court then said that "this is a long history with Mr. Banks, not this particular behavior, but coming to court when he pleases and things of this nature and refusing to come and the court having to get orders to remove him from the cell and playing those games with him. [¶] We will not continue to play the games with Mr. Banks. [¶] My intention is to have Mr. Banks far removed from the proceedings until concluded."

The next day the court reiterated this ruling after hearing defense counsel's argument that defendant's behavior may have been attributable to his not being medicated. In reaching this conclusion, the court determined that it could not "think of a restraint, short of absolute mummification, which I don't propose, that would protect the participants and the integrity of the trial."

Later that day, the court had defendant brought to the courtroom, explained its ruling, and asked defendant if he wished to have speakers installed in the lockup to allow him to hear the proceedings. The court allowed defendant to confer with counsel but denied his request for "a few minutes alone" with her. When defendant then refused to answer whether he wanted a speaker, the court ordered him escorted out of the courtroom, at which point defendant responded "Shut up" and spat on the trial judge from approximately 12 feet away.

The trial court said that if either party believed appellant's presence to be necessary in order to give testimony or to be identified by other witnesses, that party could so move, and the court would hear arguments on whether and how to make appropriate arrangements. Defense counsel never moved for defendant to be readmitted to the courtroom during the penalty phase retrial, and defendant did not

79

return.  Over counsel's objection, defendant also was not permitted to be present when he was formally sentenced.  Instead, he was held in lockup, approximately 10 feet outside the courtroom, with the door open so that he could hear.

### b) Analysis

In *Illinois v. Allen* (1970) 397 U.S. 337 (*Allen*), the high court said that "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." (*Id.* at p. 338.)  Nonetheless, "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.  Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (*Id.* at p. 343, fn. omitted.)  Thus, before ordering a defendant excluded from his own trial, a court must warn the defendant that the conduct in question will lead to his or her exclusion.  And a defendant who has been excluded must be permitted to return upon demonstrating a willingness to reform.  Our Legislature has codified these rules at Penal Code section 1043, subdivisions (b) and (c).

Applying these standards, we conclude that the trial court did not abuse its discretion in excluding defendant from his penalty phase retrial.  Because of the prior conflict between defendant and the court regarding defendant's attendance at trial, defendant had already been expressly warned that misconduct could result in his exclusion from trial.  Defense counsel acknowledged that defendant had been warned he could be excluded if he "d[id] not behave himself in court."  Whether

80

or not a broadly worded, general warning to a defendant at the outset of trial is ordinarily sufficient to justify excluding the defendant for any subsequent misconduct, the trial court did not abuse its discretion in failing to give defendant additional warnings under these unique and egregious circumstances. It is difficult to imagine conduct more repugnant to the orderly conduct of a trial or more disrespectful of the dignity of the courtroom and its participants than defendant's act of throwing a bag of excrement and urine at the trial judge. Moreover, we agree with the trial court's observation that the degree of premeditation involved in creating and hiding the projectile in question belies any claim that his actions reflected a momentary lapse of impulse control. Any remaining doubt as to defendant's ability or willingness to control his behavior was dispelled the next day, when defendant spat on the judge from 12 feet away. Defendant's purposeful defilement of the courtroom went much farther than more typical types of misconduct, such as verbal disruptions or abusive language, that might call for a specific warning before a defendant is excluded from trial. (Cf. *People v. Medina* (1995) 11 Cal.4th 694, 739 [defendant was properly excluded for verbal disruptions where "[t]he court repeatedly made it clear to defendant that he would continue to be removed if his disruptive conduct persisted . . . ."].) Defendant cannot seriously claim that he lacked "full knowledge and appreciation" that his extreme misconduct would likely result in his exclusion from the courtroom. (*People v. Sully* (1991) 53 Cal.3d 1195, 1239.)

We also reject defendant's suggestion that the trial court erred in failing to consider less restrictive measures such as shackling. That claim is forfeited because defense counsel never asked the court to consider such measures. Instead, counsel suggested a delay of trial to determine what medications her client was taking. But even if the claim were not forfeited, *Allen* makes clear that a trial court does not commit constitutional error when it opts to exclude a defendant

81

from the courtroom in response to "extreme and aggravated" conduct, even when options such as shackling are also available. (*Allen*, *supra*, 397 U.S. at p. 346; see *People v. Pena* (1992) 7 Cal.App.4th 1294, 1310.)

Similarly, defendant's claim that the trial court failed to give him a chance to return to trial fails. Defense counsel never informed the court that defendant was willing to reform his behavior and wished to be readmitted to the courtroom. Neither *Allen* nor section 1043 requires courts to affirmatively inquire whether a defendant wishes to return to trial and is willing to conduct himself properly. It is a defendant's duty to "reclaim" his right to be present at trial by moving to do so and by demonstrating a willingness "to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (*Allen*, *supra*, 397 U.S. at p. 343; see *U.S. v. Nunez* (10th Cir. 1989) 877 F.2d 1475, 1477–1478.)

## 2. *Exclusion of Evidence of Institutional Failure*

Defendant sought to introduce evidence that while he was detained as a juvenile at state-run CYA facilities, CYA psychiatrists recommended that he be screened for organic brain damage and treated accordingly, but he never received the recommended treatment. The trial court prohibited defendant from presenting this evidence of institutional failure or evidence that the recommended treatment might have improved his mental health or life chances. We conclude that the trial court erred under clearly established precedent, but we find the error harmless.

### a) *Background*

The trial court forbade defense counsel from presenting any evidence that defendant had not received proper care during the portions of his childhood when he was in state custody. The trial court repeatedly stated its position in stark terms: "If this is one of these 'the system failed him type' of issue [sic] and here is

82

proof of it, we will not hear it." "The issue is not whether the system is a good one or bad one. The system is not on trial." "We are not going to have testimony to prove that any particular agency or bureaucrat was less than stellar in their performance. [¶] They never are and that's thankfully not an issue for the jury to resolve. [¶] These cases do not turn on whether somebody could have done a better job." This order affected the testimony given by two or three defense witnesses.

First, Dr. Louis Weisberg, the psychologist who examined defendant at the age of 15 while he was in CYA custody, testified that he had diagnosed defendant as suffering from a severe conduct disorder, intermittent explosive disorder, and potential organic brain dysfunction, and had recommended neurological testing and an intensive treatment plan. However, the court sustained an objection when defense counsel asked if Dr. Weisberg expected that his treatment recommendations be carried out. Second, the court prohibited Dr. Ira Mansoori, another CYA psychiatrist, from testifying that he too had recommended defendant receive neuropsychological testing and that such testing would have been available at another facility to which defendant could have been transferred. Third, defendant asserts that Juanita Terry, the protective services social worker who had dealings with defendant when he was a child, would have testified about "issues relating to institutional failure," although defendant does not indicate what Terry might have said.

### b) Analysis

Aside from a footnote, unsupported by any facts or authority, that claims not to concede the question, the Attorney General does not seriously contest that it was error for the trial court to prohibit defendant from presenting evidence of institutional failure. The Attorney General is correct not to contest this point. We

have said that at the penalty phase of a capital case "evidence [i]s relevant and admissible insofar as it suggest[s] that defendant had sought and/or been denied treatment which might have controlled the same dangerous personality disorder that purportedly contributed to the instant crimes. The jury could reasonably view such fact as bearing on defendant's moral culpability. (See *People v. Ramirez* (1990) 50 Cal.3d 1158, 1173.)" (*People v. Mickle* (1991) 54 Cal.3d 140, 193; see *People v. Thornton* (2007) 41 Cal.4th 391, 457–458 [recognizing defendant's institutional failure defense]; *In re Lucas* (2004) 33 Cal.4th 682, 718–719 [similar].) Thus, the trial court abused its discretion in prohibiting defendant from presenting evidence that the correctional facilities in which he was housed failed to diagnose and treat his neurological problems.

However, the Attorney General is correct that this error was harmless. The following testimony was excluded as a result of the court's erroneous order: (1) Dr. Weisberg was not allowed to answer a question posed by counsel as to whether CYA followed his recommendations that defendant receive neurological testing and intensive treatment; (2) defense counsel was not allowed to elicit testimony from Dr. Mansoori that he recommended neurological testing that would have been available at a different CYA facility than the one where defendant was housed; and (3) defendant did not elicit testimony from protective services worker Juanita Terry about any possible institutional failure. But defendant made no offer of proof that any of the witnesses would testify that had he received the recommended testing and treatment, he might have turned out to be a less violent adult. Nor did defendant proffer such evidence from Dr. Gold, the neurological expert who diagnosed his organic brain damage.

In fact, the only evidence on the subject was to the contrary. Another defense expert, Dr. Osborne, testified that defendant had often failed to take medication prescribed to him over the years. Dr. Osborne also testified that

84

defendant would likely remain violent, at least until the age of 40. And the prosecution's psychiatric expert, Dr. Ronald Markman, testified that the type of brain malfunction from which defendant suffers would not determine whether an individual would be a moral person and did not cause defendant to commit the murders at issue here or the multiple violent crimes he had previously committed. We therefore conclude that the trial court's error in excluding the institutional failure evidence was harmless.

### 3. *Evidence of Future Dangerousness*

The trial court overruled defendant's objections to testimony elicited by the prosecution from a defense expert witness that defendant would remain dangerous for years to come. We conclude that the trial court did not abuse its discretion because defendant opened the door to the future dangerousness testimony by questioning the witness about the medications that would be available to treat defendant in prison.

### a) *Background*

Defense expert witness Dr. Carl Osborne testified that defendant suffered from temporal lobe damage in addition to several behavioral disorders. During direct examination, defense counsel elicited testimony that certain medication could help control defendant's behavior but that defendant had never consistently taken his medication. The court interrupted to ask Dr. Osborne, "They can't force him to take them [the medications] in state prison either, can they?" Dr. Osborne answered, "I believe there is a hearing in which they can, but I'm not certain." The court asked, "They hold them down and make them take them?" And Dr. Osborne responded, "Usually they jab them with a needle."

Defense counsel did not object to the court's line of questioning. Instead, she then asked Dr. Osborne, "What is the medication that they are using in state

prison?" Dr. Osborne responded, "There are many. [¶] Probably the most commonly used one is Haldol. In inside circles they call that the baseball bat."

During cross-examination, the prosecution asked, over defense objection, whether defendant was "currently prone to violence." The following exchange then occurred:

"[Dr. Osborne]: Currently prone to violence? [¶] Mr. Banks has — [¶] I do not mean to be evasive here, but let me state fully that Mr. Banks has a long history of violent behavior over situations and over time. [¶] He will remain as violent as he always has been.

"Q: Forever?

"A: Barring something being done, not forever. [¶] One of the things that is wrong with Mr. Banks remits substantially, especially in terms of violent behavior when a person is in their forties.

"Q: So we have to look forward to 16 more years of what we have seen in the past?

"A: No. Mr. Banks, no matter what happens during this proceeding, will never be on the street again and violent behavior is very situational and specific."

The prosecutor then elicited testimony that defendant had harmed his teacher, Sandra Hess, while in a correctional facility and that the prison where defendant would be detained might have guards, visitors, nurses, psychologists, and district attorneys, any of whom defendant might harm in the future given his violent tendencies.

In his closing statement, the prosecutor referenced this testimony as an argument in support of imposing the death penalty over defense objection. "The problem with putting Mr. Banks, who has no moral conscience, someplace, any place, even a prison, is there are teachers and counselors and guards and visitors and nurses and doctors, prison administrators, staff, secretaries, Board of Prison

86

Terms people, deputy district attorneys, there are other civilians that come into contact with people in the prison system as part of doing their daily routine. [¶] And Mr. Banks doesn't care who he victimizes. He doesn't care who his victim is. He will randomly select them and he will get rid of them and he will execute them and he has done so."

### b) Analysis

Defendant argues that the court erred by questioning Dr. Osborne on its own initiative as to whether defendant's behavior could be controlled through medication in prison, and by overruling defense objections to the prosecutor's questioning of Dr. Osborne and portions of the prosecution's closing argument relating to defendant's future dangerousness. Defendant has forfeited his argument that the court's questions were improper by failing to object. (See *People v. Harris* (2005) 37 Cal.4th 310, 350.) However, he preserved his objections to the prosecutor's questions and closing argument, so we address them on the merits.

In California, "[t]he law is settled: expert testimony that a capital defendant will pose a danger in the future if his life is spared is inadmissible [citation], but 'prosecutorial argument regarding defendant's future dangerousness is permissible when based on evidence of the defendant's conduct rather than expert opinion' [citation]." (*People v. Boyette* (2002) 29 Cal.4th 381, 446; see *People v. Murtishaw* (1981) 29 Cal.3d 733, 767–768, overruled by statute on other grounds as stated in *People v. Boyd* (1985) 38 Cal.3d 762, 773 (*Boyd*).) Under federal law, however, "[b]ecause expert evidence of future dangerousness is not barred by the United States Constitution," the introduction of such evidence does not violate a defendant's Eighth Amendment right to a reliable penalty determination. (*Boyette*, at p. 446.)

87

Here, the prosecutor clearly elicited expert testimony from Dr. Osborne as to defendant's future dangerousness and then relied on defendant's future dangerousness in closing argument. However, the Attorney General suggests that such questioning was proper because defense counsel opened the door by eliciting expert testimony that defendant might behave well in prison.

We agree. " 'While the prosecution is prohibited from offering expert testimony predicting future dangerousness in its case-in-chief [citation], it may explore the issue on cross-examination or in rebuttal if defendant offers expert testimony predicting good prison behavior in the future.' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1260.) Here, defense counsel did not necessarily open the door to questions about defendant's future dangerousness by asking merely whether any medication existed to treat defendant's condition. Nor can we say that *defendant* opened the door to questions about his dangerousness in prison based on *the court's* own questioning as to whether defendant might receive treatment in prison. But instead of objecting to the court's line of questioning, defense counsel extended it by asking Dr. Osborne what type of medication would be made available to defendant and eliciting testimony that he might receive Haldol, a medication referred to as the "baseball bat." Because the clear implication of this testimony was that defendant's behavior could be controlled in prison, the trial court did not abuse its discretion in allowing the prosecution to elicit testimony about defendant's future dangerousness in prison. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1211, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459 [cross-examination on future dangerousness permitted because the "clear implication" of the expert's direct testimony was that defendant would be a well-behaved prisoner]; see also *Jones*, *supra*, 29 Cal.4th at pp. 1260–1261; *People v. Ochoa* (1998) 19 Cal.4th 353, 462.) For the same

reason, the trial court did not abuse its discretion in allowing the prosecution to raise the issue of future dangerousness during closing argument.

### 4. *Exclusion of Evidence Regarding Antisocial Personality Disorder*

Defendant argues that the trial court violated his constitutional right to present a defense by striking Dr. Carl Osborne's testimony regarding defendant's antisocial personality disorder (APD). We agree that the court abused its discretion in striking Dr. Osborne's APD testimony, but we find the error harmless.

### a) *Background*

Dr. Osborne testified that he examined defendant for 18 hours over eight separate visits, interviewed family members, reviewed relevant mental health documents from defendant's life, and conducted numerous psychological tests. Dr. Osborne concluded: "In general, Mr. Banks suffers from several severe and chronic mental illnesses. [¶] Among those are intermittent explosive disorder and anti-social personality disorder and probably substance dependence."

Dr. Osborne explained APD. "In the broadest sense it means that the person engages in a number of acts that are illegal and outside the normal social and moral boundaries of the society in which they live. [¶] It comes in a number of different forms and it has a number of additional dimensions that can be present but do not necessarily have to be present. [¶] By and large though, it is a life long problem." Dr. Osborne also explained that "[t]he essential feature of antisocial personality disorder is a pervasive pattern of disregard for and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood." The prosecutor did not object to this testimony.

Dr. Osborne also testified that he was aware that Dr. Gold, defendant's neurological expert, believed that defendant suffered from organic brain damage

to his right temporal lobe. Dr. Osborne concluded that his own diagnosis was "completely consistent with the theory of underlying brain damage." Furthermore, "[t]emporal lobe damage is also consistent with antisocial personality disorder type behavior that Mr. Banks exhibits. [¶] They interact together. . . . [¶] What happens with the kind of physical damage, brain damage, that we are talking about is it affects broadly impulse control. [¶] It affects aggressive impulses and sexual impulses. And these are the kinds of behaviors, sexual behaviors, aggressive behaviors, that also contribute to a diagnosis of antisocial personality disorder. [¶] So you get an added effect one on top of the other."

Dr. Osborne also explained the procedures he used when diagnosing defendant with APD. He relied on the documentation of defendant's past behavior since age nine, including defendant's behavior while in protective services and group homes. Defense counsel then asked whether defendant was born with APD. Dr. Osborne responded: "That is a new answer for me to be able to give. [¶] We have suspected for a long time, in fact the [fourth edition of the Diagnostic and Statistical Manual of the American Psychiatric Association], as I said was published in 1994 and has several statements that say: [¶] We believe this, or it is assumed or presumed that this travels in families. [¶] In 1995, there was a cluster of research articles that was published in Archives of General Psychiatry, which I find very persuasive, that shows that, in fact, this is a genetically inherited problem."

Defense counsel then asked, "What was it about Kelvyn's genetic make up [*sic*] that you felt that that was part of the diagnosis?" Although the prosecution did not object, the court interrupted the testimony, excused the jury, and instructed counsel that it would hold a *Kelly*/*Frye* hearing the following day to determine the admissibility of evidence that APD is hereditary. (See *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Frye*).)

90

At the *Kelly*/*Frye* hearing the next day, the prosecution for the first time raised its own concerns about Dr. Osborne's testimony that APD may be hereditary. The court then heard testimony from Dr. Osborne regarding the acceptance in the psychological community of the view that APD is hereditary. After reviewing numerous articles and reports on APD's inheritability, the court ruled that the heritability testimony was inadmissible.

The court explained its ruling: "This testimony is inadmissible, I believe, on a number of grounds. [¶] When I say 'this testimony', I am referring to this testimony having to do with A.P.D., its inheritability, opinions by your expert of its potential heritability, opinions by your expert that your client may have inherited to some degree the propensity for this condition, i.e., to commit criminal conduct, the opinions that his parents suffered from this [¶] . . . [¶] disorder. [¶] The opinions that Kelvyn's parents suffered or suffer from this same malady since there is absolutely no foundation whatsoever in this record showing that opinion and any testimony having to do with this witness' opinions on those areas seem to me to be wholly without foundation, without relevance, to be so vague as to invite rampant speculation in the jury to have the great potential to mislead this not educated for the most part jury."

The court continued: "It does nothing but tell the jury what everybody knows. If you come from a bad background or have bad parents, you may turn out that way yourself. [¶] If the doctor wants to testify that oftentime if a person comes from a background that may be seen as less than ideal, i.e., a father who is not there, as apparently Mr. Banks' father was absent, that seems to be the great correlator in my experience, but if he wants to testify that Mr. Banks' father was not there, his mother was inept, and I would concur, she was inept in the extreme, a drunk and drug abuser and just does not have it together, if he wants to testify

91

that oftentime those sorts of conditions can breed a child that has a less than even chance, I have no problem with that."

Following the hearing, the defense resumed its direct examination of Dr. Osborne. The questions proceeded as follows:

"[Defense counsel]: Dr. Osborne, yesterday we were discussing your diagnosis, part of your diagnosis, that Kelvyn Banks has an antisocial personality disorder.

"[Dr. Osborne]: Yes.

"[Defense counsel]: And you came to your conclusion by your psychiatric testing, your interviewing Kelvyn and the study of the records and the background that you got.

"[Dr. Osborne]: I did.

"[Defense counsel]: Okay. [¶] To come to that diagnosis, did you look at the type of people his parents were?

"[Dr. Osborne]: Yes.

"[Defense counsel]: And what was [sic] some of the characteristics that his parents had that had an influence on Kelvyn?"

Following this question, the court immediately called a sidebar conference to explain that it found the questions overreaching. Defense counsel said she was "not asking if [defendant's mental illnesses] were inheritable at this point." Evidently frustrated with defense counsel's line of questioning, the court said: "I will tell you what I will do. [¶] It is going to be very difficult for the jury to understand. I will strike all references to A.P.D. in the record." When defense counsel asked if the court would strike Dr. Weisberg's testimony about the meaning of APD, the court responded, "This witness." The court then explained to the jury: "You may have heard testimony by this witness to something that he referred to as A.P.D., antisocial personality disorder. [¶] . . . [¶] That testimony is

92

stricken from the record as being without foundation in this case. [¶] So you are to disregard the references to that syndrome."

Subsequently, Dr. Osborne sought to testify that he had never encountered another individual with the same combination of brain damage and mental illnesses as defendant. The court interrupted to summarize Dr. Osborne's testimony about the combination of defendant's mental illnesses as follows:

"The Court: So whatever you are characterizing as temporal lobe disorder and explosive and then something that I have already stricken that you insist on calling antisocial personality disorder which simply means in the court's estimation —

"[Defense counsel]: There will be an objection.

"The Court: — committing crimes over and over, that is why it is stricken. [¶] So now what we are left with, so we have a clear record for the jury's sake, temporal lobe disorder, as we heard about, and explosive what?

"[Dr. Osborne]: Intermittent Explosive Disorder.

"The Court: Intermittent Explosive Disorder and other than what has been stricken. [¶] Is that it? And drug abuse?

"[Dr. Osborne]: Polysubstance dependence."

### b) Analysis

Defendant does not contest the trial court's decision to exclude testimony that APD is hereditary. We therefore do not address the propriety of that ruling. Instead, defendant contends the court erred in striking the rest of Dr. Osborne's testimony about APD, i.e., his diagnosis that defendant suffered from the disorder and that it was compounded by defendant's organic brain damage, which Dr. Gold had diagnosed. The Attorney General responds that the testimony was properly

93

struck because Dr. Osborne lacked any foundation for his view that APD is hereditary and because that belief infected his entire diagnosis.

A claim that expert opinion testimony was improperly admitted or excluded is reviewed on appeal for abuse of discretion. (See *People v. Catlin* (2001) 26 Cal.4th 81, 131.) The *Kelly/Frye* rule "conditions the 'admissibility of expert testimony based upon the application of a new scientific technique' on a 'preliminary showing of general acceptance of the new technique in the relevant scientific community.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 265, quoting *Kelly*, *supra*, 17 Cal.3d at p. 30; see *Frye*, *supra*, 293 Fed. at p. 1014.) However, we have said that expert psychological testimony diagnosing a defendant as suffering or not suffering from a particular disorder after conducting standard personality testing "is not subject to *Kelly/Frye*," at least "absent some special feature which effectively blindsides the jury." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1157 (*Stoll*); see *People v. Smithey* (1999) 20 Cal.4th 936, 967; *People v. Eubanks* (2011) 53 Cal.4th 110, 140.) If some portion of the expert's diagnosis is based on an unacceptable procedure or technique, "the witness may be allowed to 'state his opinion after excluding from consideration the matter determined to be improper.' " (*Stoll*, at p. 1155, fn. 19.)

Here, the trial court held a *Kelly/Frye* hearing to determine only whether the heritability of APD is an established scientific theory or process. The prosecution told the court it had no issue with the remainder of Dr. Osborne's APD testimony. The trial court concluded that testimony regarding APD's heritability would not satisfy the *Kelly/Frye* test. As noted, defendant does not challenge that ruling.

In subsequently striking Dr. Osborne's entire APD diagnosis, the trial court abused its discretion. A diagnosis of APD involves no "special feature which effectively blindsides the jury." (*Stoll*, *supra*, 49 Cal.3d at p. 1157.) To the

94

contrary, both Dr. Osborne and Dr. Weisberg before him testified that APD is a well-recognized form of mental illness that was included in the then-current edition of the Diagnostic and Statistical Manual of Mental Disorders, the leading treatise on psychological conditions. We have recognized that such testimony is routinely presented in capital cases. (See *People v. Hines* (1997) 15 Cal.4th 997, 1065 [collecting cases].)

The Attorney General acknowledges that psychological diagnoses are not typically subject to exclusion under *Kelly/Frye* but argues that Dr. Osborne's APD diagnosis "rel[ied] on a genetic component, which is a new scientific basis for the diagnosis." Contrary to the Attorney General's assertion, however, it is not clear that Dr. Osborne's diagnosis relied on genetics. He testified that his diagnosis was based primarily on defendant's "past behavior." He later agreed with the statement that "in com[ing] to that diagnosis," he "look[ed] at the type of people [defendant's] parents were." But that testimony does not establish whether Dr. Osborne's diagnosis was based on nature or nurture. As the trial court recognized, parental influence is a proper basis for reaching a psychological diagnosis. It is true that after initially stating that he had relied on defendant's past behavior in reaching his diagnosis, Dr. Osborne further testified that there was new scientific evidence that APD is hereditary. But nowhere did he indicate that his diagnosis was *based on* that new scientific evidence.

The record does not indicate one way or the other whether Dr. Osborne relied on genetics in diagnosing APD because the trial court struck his testimony about APD in its entirety instead of allowing him to answer a question by defense counsel that might have clarified the matter: "What was [sic] some of the characteristics that his parents had that had an influence on Kelvyn?" Moreover, even if Dr. Osborne's diagnosis had been based in part upon defendant's genetic makeup, Dr. Osborne should have been permitted to " 'state his opinion after

excluding from consideration the matter determined to be improper.' " (*Stoll*, *supra*, 49 Cal.3d at p. 1155, fn. 19.) In other words, Dr. Osborne should have been allowed to testify whether he would have diagnosed defendant with APD in the absence of any assumptions about its heritability. Thus, the trial court's order striking *all* of Dr. Osborne's APD testimony was an abuse of discretion.

The error, however, was harmless. First, Dr. Weisberg gave very similar testimony. He defined APD and explained that defendant had "antisocial personality traits." Dr. Weisberg was unable to diagnose defendant with APD due to defendant's age at the time of the examination. But he had diagnosed defendant with a conduct disorder that is the analog of APD for juveniles.

Second, the jury heard the rest of Dr. Osborne's testimony that defendant suffered from other mental illnesses. It also heard Dr. Gold's testimony that defendant had organic brain damage. The jury did not find that evidence to outweigh the aggravating factors in this case. It is not plausible that the jury would have reached a different conclusion had it been able to consider testimony that defendant also suffered from one additional nonhereditary mental illness, an illness that, according to Dr. Osborne, is characterized primarily by the fact that the individual engages in "a pervasive pattern of disregard for and violation of the right of others" and affects "80 percent of the people in the prison systems." In fact, it is often the case that *prosecutors* seek to establish that a defendant suffers from APD. (See, e.g., *People v. Mills* (2010) 48 Cal.4th 158, 207 (*Mills*); *People v. Alfaro* (2007) 41 Cal.4th 1277, 1327.) Here, at the first penalty phase trial, it was the prosecutor who attempted to elicit testimony that defendant had APD.

We therefore conclude that there is no reasonable possibility that defendant was prejudiced by the trial court's exclusion of Dr. Osborne's testimony that defendant suffered from APD.

96

5.    *Ordering Defendant to Submit to Psychiatric Examination by Dr. Ronald Markman*

Defendant argues that the trial court violated his statutory rights and his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution by ordering him to cooperate with a prosecution-retained psychiatrist, Dr. Ronald Markman.  At the time of trial, California law prohibited trial courts from ordering criminal defendants to submit to psychiatric examinations conducted by prosecution experts.  (See *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1116 (*Verdin*).)  In *Verdin*, we said that Penal Code section 1054, subdivision (e) prohibited courts from ordering any discovery in criminal cases beyond what is expressly authorized by statute or compelled by the United States Constitution.  (*Verdin*, at p. 1103.)  Because no statute or constitutional provision in effect at the time authorized trial courts to compel a criminal defendant to submit to a mental health examination (a form of discovery), courts lacked power to order such examinations.  (*Id.* at pp. 1106–1108.)

Shortly after *Verdin*, the Legislature amended Penal Code section 1054.3 to expressly authorize courts to compel a mental examination by a prosecution-retained expert.  (See § 1054.3, subd. (b), as amended by Stats. 2009, ch. 297, § 1.)  But because this case predates that amendment, *Verdin* applies.  (See *People v. Gonzales* (2011) 51 Cal.4th 894, 927 & fn. 15 (*Gonzales*).)

We have made clear that even in cases governed by *Verdin*, trial courts had the power to order defendants to submit to a psychological examination by a *court-appointed* expert pursuant to Evidence Code section 730.  (See *Gonzales*, *supra*, 51 Cal.4th at p. 927; *Verdin*, *supra*, 43 Cal.4th at p. 1110.)

The parties disagree as to whether Dr. Markman was a prosecution expert improperly appointed under *Verdin* or a court-appointed expert properly appointed pursuant to Evidence Code section 730.  The record is ambiguous on this point.

97

On one hand, the prosecution's motion to appoint Dr. Markman as a court-appointed expert during the first penalty phase quoted, but did not cite, Evidence Code section 730.  On the other hand, during argument over Dr. Markman's appointment at the first penalty phase trial, the prosecutor described Dr. Markman as having "been employed to provide assistance in psychiatric work for the prosecution."  And at the second penalty phase, he described Dr. Markman as "the People's psychiatrist."

We need not resolve whether the trial court's order that defendant speak with Dr. Markman violated defendant's statutory or constitutional rights, however, because defendant forfeited the argument by failing to raise it below.  Defense counsel strenuously objected to Dr. Markman's appointment at the first and second penalty phase trials, but did so only on the ground that Dr. Markman was a forensic psychologist, rather than a neurological psychologist (or neuropsychologist), and was thus not qualified to respond to defendant's neurological expert testimony.  In fact, defense counsel said she would have no problem with defendant being ordered to see an expert whom she considered to be qualified:  "I said I would not object if [the prosecution] had a neuropsychologist that they wanted to examine Mr. Banks."  The court overruled defendant's objection that Dr. Markman was unqualified, and defendant does not renew that objection on appeal.

By arguing only that Dr. Markman was not a qualified expert, defendant forfeited any argument that it was unlawful for the court to compel him to speak with *any* prosecution expert.  (See *Gonzales*, *supra*, 51 Cal.4th at p. 928 [holding that a defendant who objected only to the qualifications of a psychological expert, but did not argue that compelling him to meet the expert would violate § 1054, subd. (e), forfeited his *Verdin* claim].)  Thus, defendant forfeited his *Verdin* claim.

6.     *Exclusion of Lingering Doubt Evidence*

Defendant argues that the trial court improperly prohibited lingering doubt mitigation evidence and argument, violating his constitutional right to due process. We agree that the trial court erred under California law in excluding the lingering doubt testimony, but we find the error harmless.

*a)     Background*

Before any testimony in the penalty phase retrial, defense counsel indicated to the prosecutor and trial court that she wished to cross-examine certain defense witnesses, including Latasha W. and Manzanares, regarding the reliability of their eyewitness identifications of defendant. Defense counsel believed she could make this argument "[b]ecause of the lingering doubt instruction and the fact that I can argue that in certain areas."

Although the prosecution did not object, the trial court ruled that it would not permit defendant to introduce evidence suggesting a lingering doubt as to his guilt. "We are not retrying the guilt phase. [¶] This jury is to be instructed that the defendant has been convicted of these offenses and will be punished for them. [¶] So insofar as bringing up a reasonable doubt, that will not be permitted. This case has been tried before a jury of 12 people. [¶] You may cross-examine within the scope of the direct examination. [¶] But the primary interests here are the circumstances of the crimes that the defendant was convicted of. [¶] I will not let you argue to the jury: [¶] Do not give this guy a particular penalty because maybe he is not guilty." Defense counsel responded, "I can bring out certain points such as identifications that did not match up." The court responded: "No, you can't. No, you can't. [¶] . . . This is not going to happen. I will not let you do that. That would be to retry the entire case."

Later, when defense counsel sought to examine Detective Weber about Manzanares's identification of defendant, the court interrupted to "remind both

99

counsel that the identity of the defendant as the perpetrator is not an issue in the case." Moments later and outside the presence of the jury, the trial court reiterated its ruling: "So there will not be any more questions about identification made by any witness of your client until you first ask to approach the bench and make a very convincing argument so this jury will not be misled."

Before closing arguments, defense counsel requested a lingering doubt jury instruction. The court denied the request and explained, "I think the law is clear that the defendant is entitled, through his counsel, to argue the area of lingering doubt, but this is also — that is true. You can always argue human fallibility. I mean, that is what lingering doubt is all about. Anybody can make mistakes, even though he is presumed conclusively under the law to have been proven guilty beyond a reasonable doubt. That is a fact as well. Somewhere in that nether world the courts have decided some argument might be appropriate. [¶] I want to remind you both, this jury did not hear the guilt phase and this jury most definitely did not hear all of the evidence available to both parties in the guilt phase, so any argument that a particular piece of evidence here demonstrates some doubt is obviously or may be met by an objection and may be met by a ruling of the court reminding the jury, folks, you didn't hear the evidence that led to this adjudication, you heard some of it to give you an idea — to give you an idea of the circumstances of these offense."

The court instructed the jury that "the defendant's guilt as to the [crimes of which defendant was convicted], special allegations, and special circumstances is conclusively presumed to have been shown beyond a reasonable doubt."

b) *Analysis*

Our precedent holds that "evidence of the circumstances of the offense, including evidence that may create a lingering doubt as to the defendant's guilt of

100

the offense, is admissible at a penalty retrial as a factor in mitigation under section 190.3." (*Hamilton*, *supra*, 45 Cal.4th at p. 912.) In applying section 190.3, we have cautioned that a defendant may not " 'relitigate' " the guilty verdict during the penalty phase, meaning that "a defendant may not contest 'the legality of the prior adjudication.' " (*People v. Gay* (2008) 42 Cal.4th 1195, 1223 (*Gay*).) But the fact that " 'the defendant cannot relitigate the issue of guilt or innocence . . . does not preclude the admission of evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate a defendant's culpability by showing that he actually did not kill the victim.' " (*Ibid.*) Thus, at least in cases in which the jury that decides the penalty did not adjudicate the defendant's guilt, we have said it " ' "is certainly the rule that if the evidence would have been admissible on the trial of the guilt issue, it is admissible on the trial aimed at fixing the penalty." ' " (*Id.* at p. 1221, quoting *People v. Terry* (1964) 61 Cal.2d 137, 143, fn. 1.)

Under this rule, the trial court erred in concluding that defendant was not permitted to introduce lingering doubt evidence as to whether he was correctly identified by eyewitnesses in the Foster and Coleman crimes. Indeed, the Attorney General concedes that the trial court erred. The error, however, is not one of federal constitutional dimension. (See *Hamilton*, *supra*, 45 Cal.4th at 911; *Oregon v. Guzek* (2006) 546 U.S. 517, 525–526.)

Nor was the error prejudicial in this case. We have said as a general matter that " 'residual doubt is perhaps the most effective strategy to employ at sentencing.' " (*Gay*, *supra*, 42 Cal.4th at p. 1227.) But here, the evidence of defendant's innocence was so weak as to be nearly nonexistent.

As to the killing of Coleman and the Latasha W. crimes, defendant could have introduced evidence that Latasha W. inconsistently described his complexion and the color of his shoes, and that she initially identified another individual as

101

looking like her assailant. But that evidence pales in comparison to the DNA evidence linking defendant to the crimes at the Coleman residence. Further, despite having initially identified another individual as "look[ing] like" her assailant, Latasaha W.'s identification of defendant was compelling. The moment she was presented with defendant's photograph in a six-pack array, she identified him before the officer questioning her could even place the photo array on the table. She also identified defendant at trial. In short, there is no reasonable possibility that the additional testimony defendant could have elicited to impeach Latasha W. would have had any impact on the jury's deliberations.

The lingering doubt evidence with respect to the Foster killing was arguably stronger. Defendant could have elicited testimony, as he did at the guilt phase, to partially impeach both eyewitnesses who placed him at the scene of the killing. Any such impeachment evidence, however, would have been fully undermined by Dr. Osborne. He testified on cross-examination that defendant had admitted to having committed the Foster murder because "he lost his temper because [Foster] had no money."

We therefore conclude that the trial court's order precluding defendant from presenting lingering doubt evidence was harmless beyond a reasonable doubt.

### 7. *Admission of Evidence of Testimony Regarding Prior Inadmissible Bad Acts and Bad Character*

Defendant argues that the trial court violated his state and federal constitutional rights to due process and to receive a reliable penalty determination by permitting two lines of questioning about his character and his prior criminal conduct that were not admissible as aggravating factors under Penal Code section 190.3, factors (b) and (c). The first line of questions concerned Deputy Arthur Penate's testimony about defendant's behavior in prison. The second involved

testimony by defendant's mother, Carol Sparks, about defendant's nonviolent criminal conduct as a child.

"Under well-established law, evidence of a defendant's background, character or conduct that is not probative of any specific sentencing factor is irrelevant to the prosecution's case in aggravation and therefore inadmissible. (*Boyd*,[ *supra*,] 38 Cal.3d [at pp.] 773–774.)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1202 (*Carter*).) Thus, general evidence about a defendant's bad character or his commission of uncharged crimes that do not involve the use or attempted use of violence or the express or implied threat to use force or violence is inadmissible aggravating evidence. (*Boyd*, at pp. 772–773; see § 190.3, factors (b), (c).) However, bad character evidence may be introduced as rebuttal evidence if defendant opens the door by offering good character evidence as a mitigating factor. (See *People v. Lucas* (1995) 12 Cal.4th 415, 495.)

### a) Deputy Arthur Penate's Testimony

Deputy Penate testified that defendant threw a carton of feces and urine at him from inside his jail cell. He also testified at length that defendant routinely manipulated prison staff in order to get preferential treatment and, in particular, that he used court appearances as an excuse to coerce the guards into doing him favors; that defendant was housed in an area of the prison for violent prisoners; that defendant had repeatedly taunted and threatened Deputy Penate in response to perceived slights in the days prior to and leading up to the assault; and that defendant had written graffiti in his cell saying "Penate is a bitch" and "fuck you."

As an initial matter, defendant has forfeited his claim that the trial court erred by admitting Deputy Penate's testimony that defendant was housed in a unit reserved for violent inmates. Defendant did not object to that testimony at trial and in fact cross-examined Deputy Penate as to the foundation for this testimony.

103

Thus, his objection is forfeited. (See *Carter*, *supra*, 30 Cal.4th at pp. 1203–1204.) Similarly, defendant's objection to Deputy Penate's testimony about the graffiti in his cell is forfeited because defendant did not object to that testimony.

Defendant did object to Deputy Penate's testimony regarding his conversations with defendant prior to and following the assault and his testimony that defendant routinely manipulated prison guards. We therefore address the merits of those claims.

We agree with the Attorney General that the testimony about defendant's conversations with Deputy Penate was admissible. Clearly, Deputy Penate's testimony about defendant's assault upon him with a container filled with urine and feces was admissible. Deputy Penate's testimony about his conversations with defendant revealed defendant's motive for that assault and showed that defendant acted intentionally and with forethought. Specifically, the testimony established that defendant had a grudge against Deputy Penate and that defendant viewed the assault as a way to teach Deputy Penate to respect him. This evidence was relevant because it informed the jury's determination of what weight to assign to defendant's prior violent criminal conduct. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1135; *People v. Lewis* (2001) 25 Cal.4th 610, 672; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013–1014, disapproved of on other grounds by *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 588.) Contrary to defendant's contention, admitting this testimony does not "open the door to essentially unlimited, speculative testimony about defendant's behavior and character in the guise of 'circumstances' of any factor (b) offense offered as aggravation." The admissible portion of Deputy Penate's testimony was not a freewheeling discussion of defendant's conduct in prison. It merely described the discrete interactions that directly led to defendant's assault against Deputy Penate.

104

However, we agree with defendant that Deputy Penate's testimony about defendant's attempts to manipulate prison officers was inadmissible bad character evidence and should have been excluded. This testimony bore no relation to the circumstances of defendant's assault against Deputy Penate. Indeed, the prosecutor's questioning makes clear that he repeatedly sought to have Deputy Penate testify to defendant's general reputation and behavior as an inmate. For example, the prosecutor asked: "This [manipulating people] isn't an infrequent thing with Mr. Banks?" "If he does not get what he wants, he acts out in some fashion?" "You say that he continuously manipulates and tries to control other deputies[?]" "Does Mr. Banks do particular things on days he is supposed to go to court to get additional favors?" These broad questions were not calculated to elicit information about the circumstances leading up to the assault.

The Attorney General contends that this testimony was admissible because it was rebuttal to defense counsel's cross-examination of Deputy Penate, in which counsel asked Deputy Penate whether he was aware that defendant had been diagnosed as mentally ill. But Deputy Penate repeatedly testified that he knew nothing about defendant's mental health, and the court struck a question by defense counsel that assumed defendant suffered from organic brain damage. Thus, at the time of cross-examination, there was no testimony by Deputy Penate about defendant's mental health to rebut. To the contrary, Deputy Penate had testified that he had no access to defendant's medical files and was not qualified to speak to his mental health in any case.

Thus, the trial court abused its discretion in permitting Deputy Penate to testify at length about defendant's manipulative character. (See, e.g., *Boyd*, *supra*, 38 Cal.3d at p. 778 [finding error in trial court's admission of testimony about a defendant's reputation for violence even though that "reputation may be well deserved" and "the result of one's behavior in the community"].) But the error

105

was harmless. Dr. Osborne, defendant's psychological expert, testified without objection that defendant was manipulative and always would be. Thus, *defendant's own expert witness* provided more damning evidence of defendant's manipulative character than the anecdotes recounted by Deputy Penate. There is no reasonable possibility that defendant was prejudiced by the erroneously admitted testimony.

### b) Carole Sparks's Testimony

Defense counsel elicited overwhelming testimony from police officials, social workers, neighbors, and family members that defendant's mother, Carole Sparks, abused and abandoned him on numerous occasions throughout the first six years of his life. There was also testimony that Sparks was a drug user, that she used legal or illegal drugs while she was pregnant with defendant, and that defendant's father, with whom Sparks and defendant lived for some period of time while defendant was very young, was extremely violent toward Sparks. Defense counsel called Sparks as a witness and questioned her about many of these incidents. Sparks denied most of them.

On cross-examination, the trial court permitted Sparks to testify over defendant's objection that defendant had stolen bikes or other merchandise when he was nine or ten years old. When defendant objected, the prosecutor told the court at sidebar that he wanted to question Sparks about these incidents because he had police reports stating that Sparks had taken defendant to the police station and told officers she was unable to control defendant's conduct. The prosecutor hoped to rehabilitate Sparks by showing that she had been unable to control defendant's conduct around the age of nine or 10 years old. The trial court admitted the testimony. In so doing, the court said it would instruct the jury as to what crimes they could consider as aggravating factors and also noted that testimony of petty

childhood thefts would not likely prejudice defendant given his extensive violent criminal history.

We agree with defendant that the testimony about his nonviolent childhood criminal acts should not have been admitted. We have repeatedly held that "[e]vidence that a defendant suffered abuse in childhood generally does not open the door to evidence of defendant's prior crimes or other misconduct. [Citations.] We do not believe that evidence of specific acts of abuse inflicted on [defendant] in early childhood would permit rebuttal with evidence of his subsequent misconduct . . . . And evidence and argument intended to demonstrate that [the defendant] *justifiably* was abused in the manner he was, because he was a bad boy at the age of five or six years, would be unlikely to carry much weight in the prosecution's favor with the jury." (*In re Lucas*, *supra*, 33 Cal.4th at p. 733; see *People v. Loker* (2008) 44 Cal.4th 691, 709; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1193 [holding that defendant did not open the door to the prosecutor questioning defendant's mother about his teenage criminal conduct by eliciting testimony about abuse during his early childhood].)

Likewise here, defendant introduced evidence that he was abandoned and abused by his mother during his early childhood. This testimony did not open the door to the prosecutor's introduction of evidence that defendant committed nonviolent offenses three to four years later. (See, e.g., *In re Lucas*, *supra*, 33 Cal.4th at p. 733.) Nor does the trial court's reasoning that the testimony in question was not overly prejudicial provide a basis for admitting the testimony. The Attorney General correctly does not defend this logic. Our case law prohibiting admission of nonviolent childhood criminal conduct does not exempt evidence that a trial court deems not prejudicial. We therefore conclude that the trial court abused its discretion in allowing the prosecutor to elicit evidence of defendant's nonviolent childhood criminal offenses.

Nonetheless, the error was harmless. The evidence that defendant had previously committed an array of violent crimes from a young age was voluminous. At age 14, he struck a pregnant woman in the head with a pipe, causing her to miscarry. Shortly thereafter, he choked a teacher at the CYA badly enough that she had to speak in a whisper for a week. Later, he assaulted a CYA youth counselor. At age 20, he beat, raped, and choked his pregnant girlfriend in front of her young daughter and then threatened to kill her family if she testified against him. Later, he assaulted a fellow inmate and Deputy Penate while in prison. It is implausible that the additional fact that defendant engaged in petty theft a few years before this string of escalating violent incidents significantly impacted the jury's deliberations. (See *People v. Bramit* (2009) 46 Cal.4th 1221, 1239.) Further, the trial court, as it had promised, properly instructed the jury that it was not to consider any criminal acts aside from the six enumerated offenses just described as potential aggravating factors. We presume the jury followed these instructions. (*People v. Maciel* (2013) 57 Cal.4th 482, 530.)

We therefore conclude that the trial court's erroneous admission of Sparks's testimony about defendant's prior nonviolent criminal acts was harmless beyond a reasonable doubt.

8.    *Comments to Jury During Voir Dire*

Defendant argues that several comments made by the trial court to prospective jurors misrepresented the jury's penalty phase duties. During voir dire, the trial court described the jury's task as weighing "the good and the bad" on several occasions and told prospective jurors about some but not all mitigating factors. Defendant argues that the trial court misled the prospective jurors by failing to explain that section 190.3, factor (k) permits a jury to consider as a

mitigating factor "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime."

The Attorney General is incorrect that defendant forfeited this claim by failing to object at trial. We have held that a defendant generally cannot forfeit a claim that the trial court erred at voir dire when describing to prospective jurors their penalty phase duties, just as other instructional errors cannot usually be forfeited by a defendant's mere failure to object. (See *People v. Dunkle* (2005) 36 Cal.4th 861, 929 (*Dunkle*), disapproved of on other grounds by *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

On the merits, the trial court's comments were not erroneous. We have repeatedly held that a trial court does not err when making similar comments to the jury during voir dire. (See *People v. Romero* (2008) 44 Cal.4th 386, 423 [holding that nearly identical comments made by the same trial judge who presided at defendant's trial were "proper" in "the context of voir dire" because " ' "[t]he purpose of these comments was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death trials in particular, a general idea of the nature of the proceeding" ' "]; see also *Dunkle*, *supra*, 36 Cal.4th at p. 929; *People v. Livaditis* (1992) 2 Cal.4th 759, 781.) Moreover, when instructing the jury at the end of trial, the court correctly instructed the jury that it could consider all relevant mitigating evidence under section 190.3, factor (k). Thus, there was no instructional error.

9.     *The Court's Interruption of the Defense's Closing Surrebuttal*

a)     *Background*

During the defense's closing surrebuttal, counsel told the jury "you represent society and our society likes to think of ourselves as civilized, compassionate, merciful, just. We do not sink to the level of horrendous deeds

and acts because we represent the best of what society has, not the worst. We don't kill because somebody else kills, because that lowers us to the level of a horrendous verdict." The court interrupted to tell counsel that her argument was "getting quite out of hand" and to admonish the jurors that whatever sentence they imposed, they would not have "demeaned or lowered yourselves."

Moments later, defense counsel told the jury that "[e]very morning for the rest of your lives you will look in the mirror and you have to be content with who you see and what you have done and it is much easier to look in that mirror if you give life." The trial court again interrupted saying, "[o]nce again, these arguments, counsel, if you want to sit down and formulate your thoughts to keep them ethical and lawful arguments, I will allow you too." When counsel said that she had made identical arguments without objection during the first penalty trial, the court responded, "Do you want to debate with the court or do you want to be quiet and let the court admonish the jury as to their duties? [¶] I would prefer the latter."

In fact, defense counsel had made an almost identical argument at the first penalty phase. During the first penalty phase she argued, "Every morning for the rest of your lives you will look in the mirror and you have to be content with who you see and what you have done, and it is much easier to look in that mirror if you give life." Her second penalty phase argument, which provoked the court's ire, was indistinguishable.

### b) Analysis

Defendant does not argue that the trial court was wrong to admonish counsel for her arguments. We have said it is "correct[]" for a trial court to "stop[] counsel from improperly addressing as a factor in mitigation the emotional impact a death verdict would have upon each juror. The jurors' reactions to the penalty

110

imposed would constitute emotional responses 'untethered to the facts of the case' [citation], not proper factors for consideration." (*People v. Harris*, *supra*, 37 Cal.4th at p. 355.)

However, defendant contends that by suggesting that counsel was acting illegally and unethically, the trial court's reprimand unnecessarily disparaged counsel, thereby denying defendant his state and federal constitutional rights to a fair trial, due process, and a reliable penalty determination. As noted earlier, a trial court must refrain from making "comments implying that defense counsel was behaving unethically or in an underhanded fashion" in front of the jury. (*Sturm*, *supra*, 37 Cal.4th at p. 1241; see *People v. Fatone* (1985) 165 Cal.App.3d 1164, 1175 ["When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client."].) In *Sturm*, we held that the trial court acted inappropriately when it admonished counsel in front of the jury for " 'trying to sneak' in improper evidence . . . and by admonishing the jury that defense counsel's questions were not evidence 'as much as he would like them to be evidence,' " thereby "impl[ying] to the jury that defense counsel was deliberately asking improper questions in order to place inadmissible evidence in front of the jury." (*Sturm*, at p. 1240.) We found that the trial court's disparaging remarks were improper even though the court was "[u]nderstandably frustrated by defense counsel's persistent attempts to push the boundaries of the trial court's evidentiary rulings . . . ." (*Ibid.*)

Here, the court was understandably frustrated by counsel's repeated attempts to make the jurors feel guilty about the prospect of imposing a death sentence. And it was appropriate for the court to interrupt defense counsel and to admonish the jury that there was no dishonor in making the sentencing decision lawfully entrusted to them. Nonetheless, by accusing counsel of unethical and unlawful conduct in front of the jury, the court overstepped the bounds of

111

propriety. The court admonished counsel to "sit down and formulate your thoughts to keep them ethical and lawful arguments" even though the prosecutor had not objected and even though defense counsel had made virtually identical remarks before the same trial judge, without objection, during her closing argument in the first penalty phase trial.

But this conduct, on its own, does not require reversal of the conviction. In each of the cases cited by defendant in which we have reversed a conviction as a result of intemperate remarks by the trial court, the trial court had engaged in a persistent or pervasive course of disparaging counsel and the defense. Defendant relies heavily on *Sturm*, but as discussed above, *Sturm* reversed a death verdict where the trial judge intervened throughout trial, engaged in lengthy and hostile questioning of defense witnesses, made sarcastic remarks about the defense's evidence, and belittled multiple defense witnesses and defense counsel. (*Sturm*, *supra*, 37 Cal.4th at pp. 1233–1243.) Similarly in *People v. Jackson* (1955) 44 Cal.2d 511, 518, the trial judge "[c]ontinually" interrupted defense counsel on behalf of the prosecution, appeared to refer to some of its decisions as being made on behalf of both the court and the prosecution, repeatedly denigrated defense counsel, read the jury only three of the 81 instructions requested by the defendants, and remarked on the source of those instructions in a way "as to create the impression they were not charges by the court" (*id.* at p. 520; see also *People v. Mahoney* (1927) 201 Cal. 618, 627 [trial court "persist[ed] in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utter[ed] frequent comment from which the jury [could] plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredit[ed] the cause of the defense"].)

Here, the court's intervention was an isolated reaction to an inappropriate emotional appeal during closing argument by defense counsel. The court's

comments were not made during the questioning of a witness or the taking of evidence. Contrary to defendant's argument, the court's comments would not, on their own, have "conveyed to the jury that the trial judge did not take seriously the defense theory in mitigation" (*Sturm*, *supra*, 37 Cal.4th at p. 1238) or "created the impression that the trial judge was allied with the prosecution" (*id.* at p. 1241). The trial court's comments, though inappropriate, do not rise to the level of judicial misconduct that we have held to be prejudicial.

### 10. *Judicial Bias and Denial of a Fair Trial*

Defendant argues that three incidents, in combination with all of the prior assertions of error, demonstrate that the trial judge was biased against defendant and engaged in prejudicial misconduct. We find no evidence of judicial bias in the three incidents.

#### a) *Voir Dire of Prospective Alternate Jurors*

Defendant argues that the court's differential questioning of two jurors with pro-death-penalty views and two with anti-death-penalty views betrayed judicial bias. Defendant does not argue that the trial court's rulings on the for-cause challenges to these individuals were incorrect or that these rulings were prejudicial. Instead, he argues that Prospective Alternate Jurors T.H. and R.N., who made anti-death penalty remarks in their juror questionnaires, were subjected to lengthy questioning by the court calculated to elicit disqualifying testimony, whereas the court quickly accepted Prospective Alternate Juror K.H.'s and Alternate Juror No. 1's assurances that they could be fair notwithstanding pro-death penalty answers in their juror questionnaires.

The record shows that more time was spent questioning T.H. and R.N. about their views on the death penalty (approximately 16 and eight transcript pages, respectively) than K.H. and Alternate Juror No. 1 (three and two transcript

113

pages, respectively). However, T.H. and R.N. repeatedly equivocated as to whether they could set aside their views of the death penalty in reaching a verdict. For example, Juror T.H. said, "I guess I can do it," "I think I can do that," "I guess I don't know for sure whether I can be entirely objective," "I guess I will not know for sure [if he could set aside his personal views]," and "I am becoming more uncomfortable with it." It was proper for the court to continue questioning T.H. to determine his views in light of these remarks. As for R.N., he continuously evaded the court's questions as to why he testified that he could be objective but wrote on his juror questionnaire that he would always vote against the death penalty. It was proper for the court to ask further questions to determine whether R.N. was misleading the court in order to get on the jury, as the court ultimately and reasonably found.

By contrast, K.H. and Alternate Juror No. 1 stated on their questionnaires and during voir dire that they were strong supporters of the death penalty, but they quickly testified that they could set those views aside. Only after they unequivocally and credibly said they could set their political views aside did the court cease questioning them. Indeed, when Alternative Juror No. 1 initially stated that he "guessed" he could set aside his views, the court expressed the same exasperation it had shown when trying to determine the vacillating views of T.H. and R.N.

In sum, we find no indication of judicial bias in the court's questioning of the prospective alternate jurors.

> b) *Curtailing Sandra Hess's Cross-Examination*

Defendant claims that the trial judge demonstrated bias by granting its own relevance objection to defense counsel's cross-examination of Sandra Hess when counsel asked whether Hess had consulted a school psychiatrist about defendant's

114

behavioral problems and by cutting short cross-examination when defense counsel subsequently asked Hess whether she had reviewed notes before testifying.

The trial court's comments, though brusque, were measured and appropriate. (See *People v. Snow* (2003) 30 Cal.4th 43, 78–79 & fn. 6). They came after the court had already admonished both sides that it would not tolerate any questioning of Hess regarding her teaching qualifications because the only issue raised by her testimony was whether defendant had assaulted her. The court invited defense counsel to state what relevant evidence would result from further questioning, but defense counsel gave no substantive response. The trial court's ruling betrayed no judicial bias.

### c) *Vouching for Bridget R.*

Defendant's ex-girlfriend, Bridget R., testified that defendant brutally assaulted her, raped her in front of her three-year old daughter, and threatened to kill her family if she testified against him. At the end of her testimony, the court told Bridget R., "[m]a'am, I'm sorry this happened to you and I want to thank you for coming back down." A few minutes later, after brief testimony by another witness, the court told the jury that its statement to Bridget R. had been inappropriate. "It donned on the court that this is a matter being offered in aggravation and not one of the matters that the defendant has been convicted of, unlike the murders and so forth. [¶] You will have to determine whether the incident described occurred, not me. [¶] I want you to do the following: [¶] Disregard my comments to her that the court was sorry what happened. [¶] You decide what happened. [¶] My comments mean zero, absolutely zero, when it came to that [¶] . . . [¶] It is improper and inappropriate."

A trial judge may not vouch for the credibility of a witness. (See *People v. Coddington* (2000) 23 Cal.4th 529, 616, disapproved on other grounds in *Price v.*

115

*Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Sergill* (1982) 138 Cal.App.3d 34, 38, 41.)  Although it is understandable that the judge would offer kind words to a sympathetic witness, the court's comments improperly vouched for Bridget R. by suggesting that her testimony was true.  But this exchange does not demonstrate that the court was biased against defendant.  Rather, it is clear that the court experienced a momentary lapse of judgment as a result of Bridget R.'s moving testimony.  The court quickly corrected its error and properly instructed that jury that its comments were "improper and inappropriate."  The court's prompt and sincere attempt to rectify its error makes clear that its improper comments were not motivated by, or evidence of, judicial bias.

11.     *Miscellaneous Challenges to the Death Penalty*

Defendant raises a series of challenges to California's death penalty scheme that we have previously considered and rejected.  We find no persuasive reason to reexamine those conclusions and therefore reject these challenges as follows:

"Contrary to defendant's arguments, the statutory [death penalty] scheme 'adequately narrows the class of murder for which the death penalty may be imposed [citation], and is not overbroad . . . because of the sheer number and scope of special circumstances [that] define a capital murder . . . ." (*Zamudio*, *supra*, 43 Cal.4th at p. 373.)

"[W]e reject the assertion that [section 190.3,] factor (a) is so vague and arbitrary that it leads to the wanton or freakish application of the death penalty in violation of the Eighth Amendment to the United States Constitution."  (*Mills*, *supra*, 48 Cal.4th at p. 213.)

" 'The federal Constitution does not impose on the prosecution a burden of proof as to penalty, and the state need not prove beyond a reasonable doubt whether "aggravating circumstances exist, that the aggravating circumstances

116

outweigh the mitigating circumstances, or that death is the appropriate penalty." [Citation.] Nor does the federal Constitution require that the jury be unanimous on which aggravating factors apply.  [Citation.] Nothing in the high court's decision in *Apprendi v. New Jersey* [(2000)] 530 U.S. 466, or its progeny, compels a different result.  [Citation.]  [¶ ] There is no requirement that the trial court instruct the jury that life imprisonment without the possibility of parole is the presumed sentence unless proven otherwise.' " (*People v. Duenas* (2012) 55 Cal.4th 1, 27–28.)

"Written findings by the jury during the penalty phase are not constitutionally required and their absence does not deprive defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)

"Review for intercase proportionality is not constitutionally compelled." (*People v. Williams* (2013) 58 Cal.4th 197, 295.)

"At the penalty phase, the jury properly may consider a defendant's unadjudicated criminal activity and need not agree unanimously or beyond a reasonable doubt that the defendant committed those acts." (*People v. Martinez* (2010) 47 Cal.4th 911, 968.)

"The use of restrictive adjectives, such as 'extreme' and 'substantial,' in the statute's list of potential mitigating factors does not render it unconstitutional." (*People v. Martinez, supra*, 47 Cal.4th at p. 968.)

" '[T]he phrase "whether or not" in section 190.3, factors (d) through (h) and (j)' does not allow 'the absence of a mitigating factor to be considered as an aggravating circumstance . . . .' " (*People v. Homick* (2012) 55 Cal.4th 816, 903.)

"Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants." (*People v. Williams*, *supra*, 58 Cal.4th at p. 295.)

117

Finally, "[t]he death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties." (*People v. Williams*, *supra*, 58 Cal.4th at p. 295.)

### 12. *Cumulative Error*

Defendant contends that the multiple errors that infected his second penalty phase trial were cumulatively prejudicial, even if no one error was prejudicial standing alone. We have explained why each of the errors that occurred during the second penalty phase was harmless. We are not persuaded that they are cumulatively prejudicial because collectively they do not "create[] a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill* (1998) 17 Cal.4th 800, 847.) Although the first penalty phase resulted in a mistrial, the jury divided 11 to one in favor of a death sentence. At the second penalty phase, the prosecution presented a stronger case. Defendant's primary defense at both penalty phases concerned his mental illness and brain damage. At the first penalty phase, the prosecution did not call any expert witness to rebut defendant's psychological and neurological experts. By contrast, at the second penalty phase, the prosecution called its own expert witness, Dr. Markman, who provided unequivocal testimony that defendant's mental illness and brain damage were not related to the violent crimes he had committed throughout his life. That testimony undermined the heart of the defense by delinking defendant's mental health defense from his long history of violent conduct. The relatively peripheral errors we have identified do not singly or together persuade us of a reasonable possibility that the jury would have reached a different verdict absent the errors.

## CONCLUSION

We order defendant's conviction of the willful, deliberate, and premeditated attempted murder of Latasha W. (count 2) reduced to attempted murder. We impose the lower term sentence of five years on that count unless the prosecutor files a motion in the trial court requesting resentencing within 60 days after the filing of our remittitur in the trial court.  In all other respects, we affirm the judgment.

LIU, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
                BAXTER, J.
                WERDEGAR, J.
                CHIN, J.
                CORRIGAN, J.
                ASHMANN-GERST, J.[*]

---

[*]    Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Banks

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S080477
**Date Filed:** August 14, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Charles E. Horan


_____

**Counsel:**

Stephen M. Lathrop, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen M. Lathrop
Lathrop and Villa
904 Silver Spur Road, #430
Rolling Hills Estates, CA  90274
(310) 237-1000

Allison H. Chung
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2058